**Lori L. VANDE ZANDE, Plaintiff–Appellant,**

v.

**STATE OF WISCONSIN DEPARTMENT OF ADMINISTRATION, James R. Klauser, Lee Martinson, et al., Defendants–Appellees.**

No. 94–1884.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 5, 1994.

Decided Jan. 5, 1995.

---

Lawrence Bensky (argued), Melanie E. Cohen, Lafollette & Sinykin, Madison, WI, for plaintiff-appellant.

Jennifer Sloan Lattis, Asst. Atty. Gen. (argued), Michael J. Losse, Wisconsin Dept. of Justice, Madison, WI, for defendants-appellees.

James R. Scott, Robert E. Schreiber, Jr., Jonathan T. Swain, Lindner & Marsack, Milwaukee, WI, for MRA–Management Ass'n, amicus curiae.

Richard M. Stephens, Bellevue, WA, for Nat. Federation of Independent Business, amicus curiae.

Before POSNER, Chief Judge, and ENGEL * and EASTERBROOK, Circuit Judges.

* Hon. Albert J. Engel of the Sixth Circuit.

POSNER, Chief Judge.

In 1990, Congress passed the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* The stated purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," said by Congress to be 43 million in number and growing. §§ 12101(a), (b)(1). "Disability" is broadly defined. It includes not only "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual," but also the state of "being regarded as having such an impairment." §§ 12102(2)(A), (C). The latter definition, although at first glance peculiar, actually makes a better fit with the elaborate preamble to the Act, in which people who have physical or mental impairments are compared to victims of racial and other invidious discrimination. Many such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence. Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic. (The Act is not limited to employment discrimination, but such discrimination, addressed by Subchapter I of the Act, is the only kind at issue in this case and we limit our discussion accordingly.)

The more problematic case is that of an individual who has a vocationally relevant disability—an impairment such as blindness or paralysis that limits a major human capability, such as seeing or walking. In the common case in which such an impairment interferes with the individual's ability to perform up to the standards of the workplace, or increases the cost of employing him, hiring and firing decisions based on the impairment are not "discriminatory" in a sense closely analogous to employment discrimination on racial grounds. The draftsmen of the Act knew this. But they were unwilling to confine the concept of disability discrimination to cases in which the disability is irrelevant to the performance of the disabled person's job.

542

Instead, they defined "discrimination" to include an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." § 12112(b)(5)(A).

■ The term "reasonable accommodations" is not a legal novelty, even if we ignore its use (arguably with a different meaning, however, *Prewitt v. United States Postal Service*, 662 F.2d 292, 308 n. 22 (5th Cir. 1981); H.R.Rep. No. 485, 101st Cong., 1st Sess. 68 (1990) U.S.Code Cong. & Admin.News 1990, p. 267) in the provision of Title VII forbidding religious discrimination in employment. 42 U.S.C. § 2000e(j); see *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84–85, 97 S.Ct. 2264, 2276–77, 53 L.Ed.2d 113 (1977). It is one of a number of provisions in the employment subchapter that were borrowed from regulations issued by the Equal Employment Opportunity Commission in implementation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* See 29 C.F.R. § 1613.704; S.Rep. No. 116, 101st Cong., 2d Sess. 31 (1989). Indeed, to a great extent the employment provisions of the new Act merely generalize to the economy as a whole the duties, including that of reasonable accommodation, that the regulations under the Rehabilitation Act imposed on federal agencies and federal contractors. We can therefore look to the decisions interpreting those regulations for clues to the meaning of the same terms in the new law.

■ It is plain enough what "accommodation" means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work. The difficult term is "reasonable." The plaintiff in our case, a paraplegic, argues in effect that the term just means apt or efficacious. An accommodation is reasonable, she believes, when it is tailored to the particular individual's disability. A ramp or lift is thus a reasonable accommodation for a person who like this plaintiff is confined to a wheel-chair. Considerations of cost do not enter into the term as the plaintiff would have us construe it. Cost is, she argues, the domain of "undue hardship" (another term borrowed from the regulations under the Rehabilitation Act, see S.Rep. No. 116, *supra*, at 36)—a safe harbor for an employer that can show that it would go broke or suffer other excruciating financial distress were it compelled to make a reasonable accommodation in the sense of one effective in enabling the disabled person to overcome the vocational effects of the disability.

■ These are questionable interpretations both of "reasonable" and of "undue hardship." To "accommodate" a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So "reasonable" may be intended to qualify (in the sense of weaken) "accommodation," in just the same way that if one requires a "reasonable effort" of someone this means less than the maximum possible effort, or in law that the duty of "reasonable care," the cornerstone of the law of negligence, requires something less than the maximum possible care. It is understood in that law that in deciding what care is reasonable the court considers the cost of increased care. (This is explicit in Judge Learned Hand's famous formula for negligence. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947).) Similar reasoning could be used to flesh out the meaning of the word "reasonable" in the term "reasonable accommodations." It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthy—or, like the principal defendant in this case, is a state, which can raise taxes in order to finance any accommodations that it must make to disabled employees—that it may not be able to plead "undue *hardship*," it would not be required to expend enormous sums in order to

bring about a trivial improvement in the life of a disabled employee. If the nation's employers have potentially unlimited financial obligations to 43 million disabled persons, the Americans with Disabilities Act will have imposed an indirect tax potentially greater than the national debt. We do not find an intention to bring about such a radical result in either the language of the Act or its history. The preamble actually "markets" the Act as a cost saver, pointing to "billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." § 12101(a)(9). The savings will be illusory if employers are required to expend many more billions in accommodation than will be saved by enabling disabled people to work.

The concept of reasonable accommodation is at the heart of this case. The plaintiff sought a number of accommodations to her paraplegia that were turned down. The principal defendant as we have said is a state, which does not argue that the plaintiff's proposals were rejected because accepting them would have imposed undue hardship on the state or because they would not have done her any good. The district judge nevertheless granted summary judgment for the defendants on the ground that the evidence obtained in discovery, construed as favorably to the plaintiff as the record permitted, showed that they had gone as far to accommodate the plaintiff's demands as reasonableness, in a sense distinct from either aptness or hardship—a sense based, rather, on considerations of cost and proportionality—required. 851 F.Supp. 353 (W.D.Wis. 1994). On this analysis, the function of the "undue hardship" safe harbor, like the "failing company" defense to antitrust liability (on which see *International Shoe Co. v. FTC,* 280 U.S. 291, 302, 50 S.Ct. 89, 92–93, 74 L.Ed. 431 (1930); *United States v. Greater Buffalo Press, Inc.,* 402 U.S. 549, 555, 91 S.Ct. 1692, 1696, 29 L.Ed.2d 170 (1971); 4 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶¶ 924–31 (1980)), is to excuse compliance by a firm that is financially distressed, even though the cost of the accommodation to the firm might be less than the benefit to disabled employees.

This interpretation of "undue hardship" is not inevitable—in fact probably is incorrect. It is a defined term in the Americans with Disabilities Act, and the definition is "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). The financial condition of the employer is only one consideration in determining whether an accommodation otherwise reasonable would impose an undue hardship. See 42 U.S.C. §§ 12111(10)(B)(ii), (iii). The legislative history equates "undue hardship" to "unduly costly." S.Rep. No. 116, *supra,* at 35. These are terms of relation. We must ask, "undue" in relation to what? Presumably (given the statutory definition and the legislative history) in relation to the benefits of the accommodation to the disabled worker as well as to the employer's resources.

So it seems that costs enter at two points in the analysis of claims to an accommodation to a disability. The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs. Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health. In a classic negligence case, the idiosyncrasies of the particular employer are irrelevant. Having above-average costs, or being in a precarious financial situation, is not a defense to negligence. *Vaughan v. Menlove,* 3 Bing. (N.C.) 468, 132 Eng.Rep. 490 (Comm.Pl.1837). One interpretation of "undue hardship" is that it permits an employer to escape liability if he can carry the burden of proving that a disability accommodation reasonable for a normal employer would break him. *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir.1993).

Lori Vande Zande, aged 35, is paralyzed from the waist down as a result of a tumor of the spinal cord. Her paralysis makes her prone to develop pressure ulcers, treatment of which often requires that she stay at home for several weeks. The defendants and the amici curiae argue that there is no duty of reasonable accommodation of pressure ulcers because they do not fit the

statutory definition of a disability. Intermittent, episodic impairments are not disabilities, the standard example being a broken leg. 29 C.F.R. pt. 1630 app., § 1630.2(j); *Evans v. City of Dallas,* 861 F.2d 846, 852–53 (5th Cir.1988). But an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate. Often the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment. The AIDS virus progressively destroys the infected person's immune system. The consequence is a series of opportunistic diseases which (so far as relevant to the disabilities law) often prevent the individual from working. If they are not part of the disability, then people with AIDS do not have a disability, which seems to us a very odd interpretation of the law, and one expressly rejected in the regulations. We hold that Vande Zande's pressure ulcers are a part of her disability, and therefore a part of what the State of Wisconsin had a duty to accommodate—reasonably.

Vande Zande worked for the housing division of the state's department of administration for three years, beginning in January 1990. The housing division supervises the state's public housing programs. Her job was that of a program assistant, and involved preparing public information materials, planning meetings, interpreting regulations, typing, mailing, filing, and copying. In short, her tasks were of a clerical, secretarial, and administrative-assistant character. In order to enable her to do this work, the defendants, as she acknowledges, "made numerous accommodations relating to the plaintiff's disability." As examples, in her words, "they paid the landlord to have bathrooms modified and to have a step ramped; they bought special adjustable furniture for the plaintiff; they ordered and paid for one-half of the cost of a cot that the plaintiff needed for daily personal care at work; they sometimes adjusted the plaintiff's schedule to perform backup telephone duties to accommodate the plaintiff's medical appointments; they made changes to the plans for a locker room in the new state office building; and they agreed to provide some of the specific accommodations the plaintiff requested in her October 5, 1992 Reasonable Accommodation Request."

But she complains that the defendants did not go far enough in two principal respects. One concerns a period of eight weeks when a bout of pressure ulcers forced her to stay home. She wanted to work full time at home and believed that she would be able to do so if the division would provide her with a desktop computer at home (though she already had a laptop). Her supervisor refused, and told her that he probably would have only 15 to 20 hours of work for her to do at home per week and that she would have to make up the difference between that and a full work week out of her sick leave or vacation leave. In the event, she was able to work all but 16.5 hours in the eight-week period. She took 16.5 hours of sick leave to make up the difference. As a result, she incurred no loss of income, but did lose sick leave that she could have carried forward indefinitely. She now works for another agency of the State of Wisconsin, but any unused sick leave in her employment by the housing division would have accompanied her to her new job. Restoration of the 16.5 hours of lost sick leave is one form of relief that she seeks in this suit.

 She argues that a jury might have found that a reasonable accommodation required the housing division either to give her the desktop computer or to excuse her from having to dig into her sick leave to get paid for the hours in which, in the absence of the computer, she was unable to do her work at home. No jury, however, could in our view be permitted to stretch the concept of "reasonable accommodation" so far. Most jobs in organizations public or private involve team work under supervision rather than solitary unsupervised work, and team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance. This will no doubt change as communications technology advances, but is the situation today. Generally, therefore, an employer is not required to accommodate a disability by allowing the disabled worker to work, by himself, without supervision, at home. This is the majority view, illustrated

by *Tyndall v. National Education Centers, Inc.*, 31 F.3d 209, 213–14 (4th Cir.1994), and *Law v. United States Postal Service*, 852 F.2d 1278 (Fed.Cir.1988) (per curiam). The District of Columbia Circuit disagrees. *Langon v. Dept. of Health & Human Services*, 959 F.2d 1053, 1060–61 (D.C.Cir.1992); *Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994). But we think the majority view is correct. An employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced. No doubt to this as to any generalization about so complex and varied an activity as employment there are exceptions, but it would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home.

■■■ And if the employer, because it is a government agency and therefore is not under intense competitive pressure to minimize its labor costs or maximize the value of its output, or for some other reason, bends over backwards to accommodate a disabled worker—goes further than the law requires—by allowing the worker to work at home, it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation. That would hurt rather than help disabled workers. Wisconsin's housing division was not required by the Americans with Disabilities Act to allow Vande Zande to work at home; even more clearly it was not required to install a computer in her home so that she could avoid using up 16.5 hours of sick leave. It is conjectural that she will ever need those 16.5 hours; the expected cost of the loss must, therefore, surely be slight. An accommodation that allows a disabled worker to work at home, at full pay, subject only to a slight loss of sick leave that may never be needed, hence never missed, is, we hold, reasonable as a matter of law. See 29 C.F.R. pt. 1630 app., § 1630.2(*o*); *Guice–Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir.1992); cf. *Alexander v. Choate*, 469 U.S. 287, 302, 105 S.Ct. 712, 720–21, 83 L.Ed.2d 661 (1985).

Vande Zande complains that she was reclassified as a part-time worker while she was at home, and that this was gratuitous. She was not reclassified. She received her full pay (albeit with a little help from her entitlement to sick leave), and full benefits, throughout the period. It is true that at first her supervisor did not think he would have full-time work for her to do at home. Had that turned out to be true, we do not see on what basis she could complain about being reclassified; she would be working on a part-time basis. It did not turn out to be true, so she was not reclassified, and we therefore do not understand what she is complaining about.

■■■ Her second complaint has to do with the kitchenettes in the housing division's building, which are for the use of employees during lunch and coffee breaks. Both the sink and the counter in each of the kitchenettes were 36 inches high, which is too high for a person in a wheelchair. The building was under construction, and the kitchenettes not yet built, when the plaintiff complained about this feature of the design. But the defendants refused to alter the design to lower the sink and counter to 34 inches, the height convenient for a person in a wheelchair. Construction of the building had begun before the effective date of the Americans with Disabilities Act, and Vande Zande does not argue that the failure to include 34-inch sinks and counters in the design of the building violated the Act. She could not argue that; the Act is not retroactive. *Raya v. Maryatt Industries*, 829 F.Supp. 1169, 1172–75 (N.D.Cal.1993); Mark Daniels, *Employment Law Guide to the Americans with Disabilities Act* § 1.3 (1992); cf. *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Rivers v. Roadway Express, Inc.*, —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). But she argues that once she brought the problem to the attention of her supervisors, they were obliged to lower the sink and counter, at least on the floor on which her office was located but possibly on the other floors in the building as well, since she might be moved to another floor. All that the defendants were willing to do was to install a shelf 34 inches high in the kitchenette area on Vande Zande's floor. That took care of the counter

problem. As for the sink, the defendants took the position that since the plumbing was already in place it would be too costly to lower the sink and that the plaintiff could use the bathroom sink, which is 34 inches high.

Apparently it would have cost only about $150 to lower the sink on Vande Zande's floor; to lower it on all the floors might have cost as much as $2,000, though possibly less. Given the proximity of the bathroom sink, Vande Zande can hardly complain that the inaccessibility of the kitchenette sink interfered with her ability to work or with her physical comfort. Her argument rather is that forcing her to use the bathroom sink for activities (such as washing out her coffee cup) for which the other employees could use the kitchenette sink stigmatized her as different and inferior; she seeks an award of compensatory damages for the resulting emotional distress. We may assume without having to decide that emotional as well as physical barriers to the integration of disabled persons into the workforce are relevant in determining the reasonableness of an accommodation. But we do not think an employer has a duty to expend even modest amounts of money to bring about an absolute identity in working conditions between disabled and nondisabled workers. The creation of such a duty would be the inevitable consequence of deeming a failure to achieve identical conditions "stigmatizing." That is merely an epithet. We conclude that access to a particular sink, when access to an equivalent sink, conveniently located, is provided, is not a legal duty of an employer. The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort.

In addition to making these specific complaints of failure of reasonable accommodation, Vande Zande argues that the defendants displayed a "pattern of insensitivity or discrimination." She relies on a number of minor incidents, such as her supervisor's response, "Cut me some slack," to her complaint on the first day on which the housing division moved into the new building that the bathrooms lacked adequate supplies. He meant that it would take a few days to iron out the bugs inevitable in any major move. It was clearly a reasonable request in the circumstances; and given all the accommodations that Vande Zande acknowledges the defendants made to her disability, a "pattern of insensitivity or discrimination" is hard to discern. But the more fundamental point is that there is no separate offense under the Americans with Disabilities Act called engaging in a pattern of insensitivity or discrimination. The word "pattern" does not appear in the employment subchapter, and the Act is not modeled on RICO. As in other cases of discrimination, a plaintiff can ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act making up that pattern might have an innocent explanation. The whole can be greater than the sum of the parts. But in this case all we have in the way of a pattern is that the employer made a number of reasonable and some more than reasonable—unnecessary—accommodations, and turned down only requests for unreasonable accommodations. From such a pattern no inference of unlawful discrimination can be drawn.

AFFIRMED.