Debbie GATLIN, Plaintiff,

v.

## EAST TENNESSEE CHILDREN'S HOSPITAL and Collectors, Inc., Defendants.

No. 3:98–cv–040.

United States District Court, E.D. Tennessee, at Knoxville.

Dec. 21, 1998.

Ronald A. Rayson, Burkhalter & Associates, for Plaintiff.

T. Harold Pinkley, Jr., Miller & Martin, Chatanooga, TN, for Defendants.

## MEMORANDUM OPINION

MURRIAN, United States Magistrate Judge.

This case is before the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure, for all further proceedings, including entry of judgment [see Doc. 4]. The motion for summary judgment filed by defendants, East Tennessee Children's Hospital ("ETCH") and Collectors, Inc. ("Collectors") is currently pending before this court [see Doc. 9].

This is an action brought pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq. Specifically, the plaintiff, Debbie Gatlin, claims that she was employed by the defendants on July 6, 1993, as a collections clerk; that at all times she performed all jobs assigned to her in a satisfactory manner; that during September 1996, she underwent a total left hip replacement and was required to be off work until January 7, 1997; that upon returning to work, she asked defendants to provide her with an orthopedic chair as a reasonable accommodation which would have allowed her to continue employment with defendant on a full-time basis as a collections clerk; that at the time of her initial request for accommodation, defendants failed to do an individualized assessment of her to determine whether her disability could be accommodated and failed and/or refused to provide her with the requested accommodation or similar accommodation; that this violated the ADA; that as a result of defendants' refusal to provide her with a reasonable accommodation, her medical condition intensified and she was required to receive additional medical treatment; that during early March 1997, she was advised by her treating physician, Dr. Frank Gray, that as a result of physical problems due to continued pressure on her hips, she was going to require additional surgery to her left hip; that she was advised that she would need to be off work for a period of time; that she advised her immediate supervisor, Dedra Heiskell, that she was going to have the surgery and that it could not be accomplished until April 10, 1997; that she was advised by Ms. Heiskell that if she could not return to full-time duties by April 28, 1997, she would be terminated; that she again requested reasonable accommodations of the orthopedic chair and additionally requested a possible accommodation of working a portion of the workday at home on the computer; that her request for accommodations was immediately denied despite the fact that defendant again did no individualized assessment to determine whether the requested accommodations could be provided; that at the time of her termination on April 23, 1997, the plaintiff had performed the collections clerk position for almost four years and was inherently familiar with the requirements of the job; that at the time of her discharge she was fully capable of performing all the essential functions of her job with the reasonable accommodations requested; that the aforementioned conduct by the defendants constitutes a violation of the ADA; that as a result of her wrongful termination, she has sustained and will continue to sustain a substantial loss of income and

benefits and has sustained substantial humiliation, embarrassment and emotional distress; and that the discriminatory actions of the defendants were intentional, malicious, and/or reckless so as to justify the imposition of punitive damages.

The defendants move the court for an order granting summary judgment in their favor, contending that her claim that she should have received an orthopedic chair as a reasonable accommodation is barred by her failure to exhaust administrative remedies; that plaintiff cannot establish a prima facie case in that she suffered no adverse employment action, she could not perform the essential functions of the collections clerk position, and no reasonable accommodation existed which would have made her "otherwise qualified" to work for the defendants; and that plaintiff cannot prove that the defendants' legitimate nondiscriminatory action was pretextual [Doc. 10].

The ADA prohibits an employer from discriminating against "a qualified individual with a disability" because of the disability. 42 U.S.C. § 12112(a). *See McKay v. Toyota Motor Manufacturing, U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir.1997). A "qualified individual with a disability" is defined as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . .

42 U.S.C. § 12111(8). In order to establish a case under the ADA, a plaintiff must prove that

> (1) [she] is a disabled person within the meaning of the Act, (2) that [she] is qualified to perform the essential functions of [her] job with or without reasonable accommodation, and (3) that [she] suffered an adverse employment decision because of [her] disability.

*McKay*, 110 F.3d at 371.

There is no dispute in this case that the plaintiff suffers from a "disability" within the meaning of the ADA. The question in this case is whether the plaintiff is "otherwise qualified" to perform the essential functions of her job with or without reasonable accommodation.

When a disabled employee claims that he or she is "otherwise qualified" with a reasonable accommodation, the employee "'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Cassidy v. Detroit Edison Company*, 138 F.3d 629, 634 (6th Cir.1998). *See also Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir.1997).

> The determination of whether an individual with a disability is "qualified" should be made in two steps. The first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. . . .
>
> The second step is to determine whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation. . . .

29 C.F.R.Pt. 1630, Appendix to § 1630.2(m).

There is no dispute that the plaintiff was born with a congenital hip displacement; that between the ages of 18 months and 7 years, she underwent 10 surgeries to correct this problem; that plaintiff walks with a significant limp; and that Dedra Heiskell, plaintiff's supervisor, was aware of her previous surgeries and limp when she hired the plaintiff [Doc. 10, Exhibit 1, plaintiff deposition at p. 72]. Plaintiff, Debbie Gatlin, testified at her deposition that she was hired by Ms. Heiskell in July, 1993; that in 1996, when Dr. Gray advised her that she needed a total left hip replacement, she talked to Ms. Heiskell; that Ms. Heiskell told her that after her sick and vacation time were used up, she would go on leave under the Family Medical Leave Act ("FMLA") [*id.*, at pp. 19–24]; that she needed to be on leave for three months beginning on September

30, 1996 [*id.*, at 67]; that her family medical leave expired on December 23, 1996; that Ms. Heiskell told her not to worry about it and gave plaintiff a week of her own leave [*id.*, at 68]; that when she would go in to pick up her paycheck every two weeks, Ms. Heiskell would ask her when she was coming back [*id.*, at 69]; that she returned to work on January 7, 1997, on a part-time basis as per Dr. Gray's instructions [*id.*, at p. 75–76]; that Ms. Heiskell indicated to her that she wanted her back on a full-time basis; that she asked Ms. Heiskell for an orthopedic chair; that Ms. Heiskell suggested putting a box underneath her desk for her feet; that she told Ms. Heiskell that this would not work; that after that conversation, Ms. Heiskell made no further mention of the chair; that she never again asked for the chair [*id.*, at 81]; that when she increased her hours in February, 1997, she was in tremendous pain [*id.*, at p. 83]; that she was never disciplined for leaving early; that she returned to Dr. Gray on March 11, 1997, at which time Dr. Gray told her she was not to work because she had placed too much stress on her hip [*id.*, at p. 86]; that he gave her some injections of cortisone and put her on complete bed rest for two weeks [*id.*, at p. 86–87]; that Dr. Gray wrote a letter to this effect and plaintiff gave this letter to Ms. Heiskell; that plaintiff was told to report back to Ms. Heiskell in two weeks; that when she returned to Dr. Gray two weeks later, the inflammation was still there [*id.*, at p. 88]; that Dr. Gray wanted to do a fascia release to remove the inflamed area; that the surgery was scheduled for April 10, 1997; that when she told Ms. Heiskell of the upcoming surgery, Ms. Heiskell told her that if she was not at work by April 28th, she could not hold plaintiff's job for her; that she asked Ms. Heiskell if she could do some work at home; and that Ms. Heiskell would not discuss this with her [*id.*, at p. 89]; that she told Ms. Heiskell and Mr. Bates in Human Resources that there was no way she was going to quit her job [*id.*, at p. 94]; that in Dr. Gray's April, 1997, letter, he indicated that she would need to be off from work indefinitely [*id.*, at p. 95]; that in August, 1997, she underwent a total right hip replacement; that she is still under Dr. Gray's care; that she is not currently able to work [*id.*, at pp. 110–112; 131]; and that Ms. Heiskell told her that she could reapply for a position, but that she would need a letter setting forth plaintiff's prognosis [*id.*, at p. 125]. In a "Return to Work Status Report" dated March 11, 1997, Dr. Gray stated that plaintiff could not return to work for 2(two) weeks [*id.*, Exhibit 16 to plaintiff's deposition]. In a letter dated April 24, 1997, "To Whom It May Concern" from Dr. Gray, he stated that plaintiff had recently undergone a fascia release at the left hip and would be several weeks recuperating; that the effectiveness of the surgery was undetermined; that he would treat her conservatively and would anticipate that it would be a number of weeks before her symptoms were improved; but that her outlook was indefinite [*id.*, Exhibit 17 to plaintiff's deposition]. In a letter dated June 18, 1997, "To Whom It May Concern," from Dr. Gray, he stated that plaintiff would be undergoing right total hip arthroplasty within the next several weeks; and that she would need to be out of work for an indefinite period of time, but certainly for a number of months [*id.*, Exhibit 20 to plaintiff's deposition].

Ms. Heiskell testified that when plaintiff told her that Dr. Gray had stated that she would need to take indefinite leave in March, 1997, she told plaintiff that she could not hold her position indefinitely [Doc. 10, Exhibit 2, Heiskell deposition at p. 62].

Dr. Gray testified at his deposition that he performed a total left hip replacement on plaintiff on September 30, 1996 [Doc. 10, Exhibit 4, Gray deposition at p. 10]. Dr. Gray further testified, in pertinent part, as follows:

Q. With respect to her condition, Ms. Gatlin's condition between January and March of 1997, would the use of a different type of chair at work, would that have helped her condition at all?

A. **I really don't know.** Normal ligaments like we all have stretch and contract all the time without any problem. Ligaments that are damaged or that are scarred get into a certain position and when you change that position, they don't want to just change to the new tension automatically. It takes some adjusting time. And if you are having to do that repeatedly, then that provides sort of an irritation and aggravation. That's why a lot of times, as we get older, we are stiffer in the morning. Ligaments just don't stretch out normally. But it happens in younger people, too, after an injury or after surgery. So anytime you put these tissues at a resting length for a period of time and then change that position, you can have increased symptoms. So I'm not sure changing a chair that is this height or that height or swivels or doesn't swivel will make that much difference. **I tend to doubt it.**

Q. Did you ever discuss that possibility with Ms. Gatlin or did she ever ask you, "Would the use of a particular chair help me?"

A. I don't recall that she ever asked. I don't recall ever discussing it with her. As I say, this is a fairly common problem. When I see it, I assume it's a mechanical problem and that **there is not one activity that is aggravating this.** Generally if it can't be cured conservatively, then it requires surgical intervention.

Q. Did you ever discuss with Ms. Gatlin during this period of time prior to her second—actually prior to her second surgery about—did you ever talk to her about her ability or inability to work at home?

A. I don't recall any specific conversations about that, although having seen her a number of times over the period of the year, it may well have come up. It is not the kind of thing I would probably put in an office note, but at any rate, I don't recall a specific conversation about that. I think I knew that she was still having difficulties with her daily activities. She had been doing better and then she started doing worse, and so I don't recall any specific litany of things that are more difficult now than they were three months ago.

Q. During your visit with her on March 11th of '97, would her working at home as opposed to working in an office setting, would that make a difference with respect to the pain that she was having or the problems that she was having?

A. **I don't think it matters where you are when you are doing it.** I mean, if you are going to hit your thumb with a hammer, it doesn't matter whether you do it at home or whether you do it at the office. I wanted her to cut down her activities significantly. **I told her she shouldn't be working at that time, and that would have gone along with the assumption I didn't want her putting any stress to that area.** I probably even talked to her about getting back on her crutches or a walker. I usually do that. Tell them to get the weight off of it. Do everything you can to try to rest it, you know. Every step you take when you have this is additional trauma. Every prolonged period of stretching in one position is additional trauma. You know, if you eye is red and hurting, stop sticking your finger in your eye, and that is about what this is with this hip problem, so I don't think that's—that's a 24–hour protective advice. Includes not lying on that side in the bed even.

· · · · ·

Q. If Ms. Gatlin's position entailed sitting at a computer terminal and answering the phone for a long period of time, in your opinion, would she have been able to perform that as of either the April 24th letter or the June 18th letter?

A. She was still having a lot of pain at that time because of the sciatica and she was starting to have some increasing problems, at least I can say in retrospect, since you are asking this question in retrospect, with the contralateral hip, and so it would seem to me that this

situation was not resolved. It's not the kind of situation in which I would normally send a patient back to work, albeit short trials part time and that sort of thing, I mean, like we tried back when, in January or December, you know, it didn't work, so we had to back off and try to get the problems improved again. So could she have gone back? I mean, yeah, you know, she could have gone back. She wasn't paralyzed. There were things that she was able to do. **Would this have been appropriate for her to have gone back at this time with the continued problems with the left hip and increasing problems with the right hip? I don't think so.**

. . . . .

[*id.*, at pp. 19–22; 31–32 (emphases added) ]. Regarding the use of orthopedic chairs, Dr. Gray testified as follows:

If somebody has coxodynia or pain on their tailbone, they don't want to sit on a hard, firm chair, they want something that has got a cushion they can tilt to. If somebody has got a hip problem and particularly say tendinitis or something of that type, they may be more comfortable sitting in a chair that is a little bit higher with the legs down somewhat or they may be more comfortable in a chair that is wider that allows them to move around somewhat rather than being real confined.

That becomes a very specific situation for that patient, and you basically have to rely on the patient to tell you that. I mean, there is not a chair meter that we have got to go by. So you experience around a little bit. A patient says I have got this chair I feel great in at home, you know, try something like that or bring it in.

So not to be evasive, but I think that what we have described as orthopedic chairs often are chairs that just cost three times more than ordinary chairs. But you can find usually a specific variation in a chair if you are looking for something specific, but if you are just talking about in general, I think it's a lot of hype about a lot of them and we

don't—I don't know that I have ever prescribed for anybody a specific orthopedic chair to sit in. Usually I tell them to go find what is comfortable and sit in it.

. . . . .

[*id.*, at pp. 50–51].

■ In this case, the defendants' own explanation for the plaintiff's separation was her "medical condition" (*i.e.*, her disability) [Doc. 17, Exhibit 6]. *See Monette*, 90 F.3d at 1186. Thus, plaintiff has direct evidence that the defendants' relied on her disability in making an adverse employment decision. Even so, it is plaintiff's burden to establish that she was capable of performing the essential functions of her job with the accommodations she proposed. *Monette*, 90 F.3d at 1184. Assuming for purposes of this motion that an orthopedic chair would have been a "reasonable" accommodation, plaintiff's own treating orthopedic surgeon testified that he did not discuss an orthopedic chair with plaintiff; that he really did not know if it would help, but that he doubted it; that there was no single activity that was aggravating plaintiff's condition; and that conditions such as the plaintiff's were either cured conservatively or surgically. As a result, the only "evidence" offered by the plaintiff that she could have performed the essential functions of her job if she had been provided with an orthopedic chair is her own conclusory allegation. The plaintiff's uncorroborated belief in her ability to perform the essential functions of her job is not enough to counter affirmative evidence to the contrary. *See Boback v. General Motors Corporation*, 107 F.3d 870, 1997 WL 3613, at p. *3 (6th Cir.1997) (TABLE CASE), citing *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995). The same is true of the plaintiff's proposed accommodation of working at home. Dr. Gray basically testified that in his opinion it did not matter where plaintiff was when she attempted to work and that she just should not be working. Thus, plaintiff has offered no evidence from which a jury

could reasonably conclude that she could have performed the essential functions of her job if she had been allowed to work at home or if she had been provided with an orthopedic chair.

■ Additionally, in *Smith v. Ameritech,* 129 F.3d 857 (6th Cir.1997), the plaintiff sued under, *inter alia,* the ADA claiming that he had been denied reasonable accommodations for his disability. Plaintiff had worked as a "premises sales representative" for the defendant until he was injured in an automobile accident. There was no dispute in the case that the plaintiff could not perform the essential functions of the job he held prior to his injury, but plaintiff contended that he could have been accommodated by being reassigned to a position as a collections agent and allowed to work out of his home. In upholding the District Court's award of summary judgment after the court concluded that the plaintiff had failed to raise a genuine issue of fact as to whether he was an otherwise qualified individual with a disability, the Sixth Circuit held as follows:

> The Seventh Circuit has held that the ADA does not require employers "to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced." *Vande Zande v. Wisconsin,* 44 F.3d 538, 545 (7th Cir.1995). The Fourth Circuit reached the same conclusion, holding that "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir.1994) (quoting *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd,* 831 F.2d 298 (6th Cir.1987)). *But see Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994) (stating that "in appropriate cases, [the Federal Rehabilitation Act] requires an agency to consider work at home, as well as reassignment to another position, as potential forms of accommodation"). We agree with the analysis of the Fourth and Seventh Cir-

cuits. Plaintiff has failed to present any facts indicating that his was one of those exceptional cases where he could have "performed at home without a substantial reduction in quality of [his] performance." *Vande Zande,* 44 F.3d at 544. This provides a second basis for our conclusion that plaintiff failed to propose an objectively reasonable accommodation for his disability.

*Smith,* 129 F.3d at 867. Plaintiff has not submitted evidence that she could have performed at home without a substantial reduction in the quality of her performance. *Smith, id.* Finally, Dr. Gray's April 24, 1997, letter, stated that plaintiff would be several weeks recuperating from the fascia release at the left hip; that he anticipated a number of weeks before her symptoms improved, but that her outlook was indefinite. There is no dispute that Dr. Gray's letter indicated that the plaintiff would need to remain off work for an indefinite period. An employer does not have a duty under the ADA to keep a disabled employee's position open indefinitely. *Puckett v. Porsche Cars of North America, Inc.,* 976 F.Supp. 957, 966 (D.Nev.1997). *See also Monette,* 90 F.3d at 1187 ("While it is true that employers may be required, as a reasonable accommodation, to transfer a disabled employees to a vacant position for which he or she is qualified, employers are under no duty to keep employees on unpaid leave indefinitely until such position opens up. (citations omitted).").

In light of the foregoing, I find that the plaintiff has failed to present evidence that she was a "qualified individual" protected by the ADA as she failed to demonstrate that she could perform the essential functions of her job with the accommodations she proposed. Even her treating orthopedic physician testified that he did not think that either one of these accommodations would have enabled plaintiff to work. Accordingly, the plaintiff has failed to present a prima facie case of disability discrim-

ination and the defendants' motion for summary judgment will be **GRANTED.**

Order Accordingly.