**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

v.

SARA LEE CORPORATION,

*Defendant-Appellee.*

No. 00-1534

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Patrick Michael Duffy, District Judge.
(CA-99-522)

Argued: November 1, 2000

Decided: January 9, 2001

Before WILKINSON, Chief Judge, WILLIAMS, Circuit Judge,
and Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Williams and Senior Judge Magill joined.

## COUNSEL

**ARGUED:** Robert John Gregory, Senior Attorney, EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION, Washington,
D.C., for Appellant. Robin Elizabeth Shea, CONSTANGY, BROOKS

& SMITH, L.L.C., Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Cara Yates Crotty, CONSTANGY, BROOKS & SMITH, L.L.C., Columbia, South Carolina, for Appellee.

---

**OPINION**

WILKINSON, Chief Judge:

The Equal Employment Opportunity Commission (EEOC) appeals a decision holding that Vanessa Turpin was not disabled under the Americans with Disabilities Act. The EEOC further appeals the holding that if Turpin was disabled, Sara Lee Corporation satisfied its duty of reasonable accommodation under the ADA. Because the facts of this case show that Turpin was not substantially limited in a major life activity, and because the ADA does not require an employer to deviate from its nondiscriminatory seniority policy in order to accommodate a worker, we affirm the judgment of the district court.

I.

Vanessa Turpin began work for Sara Lee at its Salem, Virginia plant in 1989. In 1992, Turpin began to experience seizures in her sleep. Although she saw a neurologist and took medication, Turpin occasionally experienced nocturnal and daytime seizures. According to Turpin's doctor, she experienced seizures about once or twice a week. The nocturnal seizures were characterized by shaking, kicking, salivating, and, on at least one occasion, bedwetting. After having these seizures, Turpin would feel tired in the morning, as if she did not sleep at all. Turpin typically was unaware that she was having seizures, and would sometimes wake up with bruises on her arms and legs.

The daytime seizures were milder in nature. Over the time period at issue in this appeal, four or five of the daytime seizures happened

during work itself. Turpin could feel the seizure about to start, and would sit elsewhere until the episode passed. The seizures normally lasted a couple of minutes. During these seizures, Turpin began shaking, her face took on a blank expression, and she became unaware of and unresponsive to her surroundings. After the seizure ended, Turpin was able to return to whatever work she had been performing before the episode started. These seizures also sometimes caused Turpin to suffer memory loss. Turpin would occasionally forget to take her medication, or forget where she was going in her car. Turpin's neurologist, Dr. Joseph Healy, diagnosed her condition as complex partial seizure disorder (epilepsy). This type of epilepsy does not normally affect motor activity, and does not cause major motor or grand mal seizures. Nevertheless, Dr. Healy believed that her seizures would be a "life-long phenomena." Still, Turpin continued to perform her job and take care of her son.

In 1996, Turpin transferred to a plant in Florence, South Carolina after Sara Lee shut down the Salem factory. At Florence, she worked the first shift as an Auto Packaging Machine Operator. In 1997, Sara Lee closed its Hartsville, South Carolina plant. The company offered the Hartsville workers the opportunity to transfer to another plant. Under Sara Lee's seniority policy, the former Hartsville workers would keep their seniority, and thus were entitled to displace current workers at the Florence plant. This seniority policy is an internal policy of Sara Lee and is not part of a collective bargaining agreement. A more senior worker from Hartsville wanted Turpin's shift, meaning that Turpin would be forced to take the second or third shift if she wanted to keep her job.

The worker who replaced Turpin had twenty years more seniority than Turpin herself. When Turpin learned that she would be displaced from her shift, she contacted the Human Resources manager to request that she be allowed to remain on the first shift. Turpin presented a letter from her doctor stating that transferring shifts would cause a disturbance of her sleep pattern, and thus worsen her seizures. Sara Lee's doctor stated that the change in shift would not disrupt Turpin's sleep patterns so long as Turpin worked a non-rotating shift, whether it be the first, second, or third shift.

Sara Lee decided not to let Turpin bypass the normal seniority policy. The company gave Turpin three options, all based upon the

seniority policy: 1) move to the second or third shift; 2) go on layoff status with recall rights for twelve months (including the right to be recalled to a first shift position should one become available); or 3) take a severance package. Turpin chose the severance package. Turpin then filed a charge of discrimination with the EEOC, which found cause and filed a complaint in February of 1999. Sara Lee moved for summary judgment, which the district court granted. The district court found that Turpin was not disabled within the meaning of the ADA, and that if she was, Sara Lee satisfied its burden of reasonable accommodation.

## II.

## A.

The EEOC argues that at the time of the relevant events, Vanessa Turpin was disabled within the meaning of the ADA.

The ADA requires that in order to be disabled under the Act, a person must have "A) a physical or mental impairment that substantially limits one or more major life activities of such individual; B) a record of such an impairment; or C) [been] regarded as having such an impairment." 42 U.S.C. § 12102(2). The EEOC argues that Turpin is disabled under the "substantially limits" prong of the definition. *See id.* at § 12102(2)(A). The phrase "substantially limits" sets a threshold that excludes minor impairments from coverage under the ADA. *See Sutton v. United Air Lines*, 527 U.S. 471, 486-88 (1999).

Vanessa Turpin suffered from seizures due to epilepsy. A person with epilepsy can certainly be disabled under the ADA. *See, e.g., Otting v. J.C. Penney Co.*, 223 F.3d 704, 709-10 (8th Cir. 2000). Indeed, epilepsy is one of the disabling conditions that Congress contemplated when it passed the ADA. *See, e.g.,* H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 52, *reprinted in* 1990 U.S.C.C.A.N. 303, 334 ("epilepsy" can be an impairment that substantially limits a major life activity). The analysis does not stop at this level of generality, however. *See Sutton*, 527 U.S. at 487-88. The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case. *Sutton*, 527 U.S. at 483; *Ennis v. National Ass'n. of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995). Thus, the cru-

cial question in this case is whether Turpin's epilepsy substantially limited one of her major life activities.

Relying on *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 543-44 (7th Cir. 1995), the EEOC first asserts that Turpin's disability can be established under an "intermittent manifestation" theory of disability. The EEOC misreads *Vande Zande*. In that case, the employee was already disabled because she was paralyzed. This paralysis caused pressure ulcers which manifested themselves on an intermittent basis. But the court did not hold that the pressure ulcers themselves were a disability. Rather, they were symptoms of the underlying disability itself. *Vande Zande*, 44 F.3d at 544. Here, the alleged intermittent manifestation (the seizure) is the disability itself. To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds. An intermittent manifestation of a disease must be judged the same way as all other potential disabilities. The statute is explicit — to be disabled under the ADA, a person must have a substantial limitation on a major life activity.

The EEOC next maintains that Turpin was substantially limited in three different major life activities — sleeping, thinking, and caring for herself. The record, however, simply does not support the assertion that Turpin was substantially limited in any major life activity. First, it is true that Turpin did not sleep well every night. Still, Turpin frequently slept through the night without any seizures. When she did have seizures, many times she did not even remember having them.

More importantly, the EEOC has failed to prove that Turpin's lack of sleep was worse than the quality of sleep of the general population. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (ADA plaintiff held not disabled because of failure to show that her sleep was significantly worse than the average person in the general population); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998) (same). Indeed, the EEOC's own regulation states that a plaintiff's significant restriction in a major life activity must be "compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(2) (2000). Many individuals fail to receive a full night of sleep. The EEOC did not show that Turpin's

seizures substantially limited her major life activity of sleeping in a manner different from the average person.

Turpin's milder form of epilepsy imposed no substantial limitation on her ability to think either. The evidence shows that on one occasion, Turpin forgot the location of her doctor's office. Two or three times a week she forgot things, and she had to write them down in order to remember. Sometimes, Turpin had trouble remembering to take a second daily dosage of anti-seizure medication. As the district court noted, however, "many other adults in the general population suffer from a few incidents of forgetfulness a week, and indeed must write things down in order to remember them." The EEOC's limited examples of such forgetfulness do not rise to the level of a substantial limitation.

Finally, Turpin's seizures did not substantially limit the ability to care for herself. The EEOC points to the fact that Turpin's husband assisted her during her seizures and occasionally after her seizures. Yet the record indicates that the seizures were relatively infrequent. The district court pointed out that Turpin's doctor "stated that Turpin's seizures were not major motor or grand mal seizures, but were of the less severe complex partial variety." Indeed, Turpin continued to perform all sorts of tasks despite her seizures. She could care for her son. She could drive a car. She performed her job effectively. The evidence is not enough to justify holding that Turpin was substantially limited in caring for herself.

The EEOC relies upon *Otting v. J.C. Penney* for the proposition that Turpin's epilepsy substantially limited a major life activity. *See* 223 F.3d at 710. In *Otting*, the Eighth Circuit held that a plaintiff who was prohibited by law from driving a car, who could not take baths by herself, and who had brain surgery to try to correct the seizures was disabled under the ADA. *See Otting*, 223 F.3d at 707, 709-10. *Otting* is not applicable to the case at bar because the determination of disability is an individualized inquiry under the ADA. *See Sutton*, 527 U.S. at 483. Turpin's symptoms were markedly less severe than those of the plaintiff in *Otting*. Turpin herself testified that the primary effects of her epilepsy were only that sometimes she would wake up with a bruise on her body, that she would sporadically "zone out" during the day, and that on one occasion she wet her bed. While

we do not make light of these symptoms, they do not rise to the level of substantially limiting any of Turpin's major life activities. The district court carefully applied the statutory test and correctly held that Turpin was not disabled under the ADA.

B.

The district court found that if Turpin was disabled, Sara Lee nonetheless satisfied its duty of reasonable accommodation by following its legitimate and non-discriminatory seniority policy. The EEOC argues that Sara Lee was required to disregard its seniority policy and bypass employees twenty years Turpin's senior in order to accommodate Turpin. We disagree.

If an employee is disabled under the statute, an employer must make "reasonable accommodations" unless the company can demonstrate that the accommodation "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Independently of the undue hardship provision, an employer is required to make only those accommodations that are "reasonable." *Vande Zande*, 44 F.3d at 542-43. An employer must also be able to set a general policy and avoid uncertainty and litigation over every request for an exception. Indeed the statute speaks in terms of accommodations, not exceptions.

Virtually all circuits that have considered the issue have held that the ADA's reasonable accommodation standard does not require an employer to abandon a legitimate and non-discriminatory company policy. *See, e.g., Burns v. Coca-Cola Enterprises*, 222 F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to . . . violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual."); *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1020 (8th Cir. 2000) ("[T]he employer is generally not required to transfer a disabled employee if such reassignment would violate . . . a legitimate, non-discriminatory policy of the employer.") (internal quotations omitted); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1176 (10th Cir. 1999) (en banc) ("[A]n industry may have a well entrenched seniority system which, even though not rooted in a collective bargaining agreement, is so well established that it gives

rise to legitimate expectations by other, more senior employees to a job that the disabled employee might desire."); *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998) ("Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers."); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc) ("An employer is not required to reassign a disabled employee in circumstances when such a transfer would violate a legitimate, nondiscriminatory policy of the employer.") (internal quotations omitted); *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir. 1997) (per curiam) ("We are aware of no case under either the ADA or the Rehabilitation Act where an employer has been required to transfer an employee to another position where the employer (independent of concerns about disability) has a business policy against the pertinent kind of transfer."); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) ("[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."). *But see Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1120 (9th Cir. 2000) (en banc) ("Any per se rule barring reassignment because of conflicts with a seniority system would sharply limit the range of available accommodations without any required showing of an undue burden on the employer. In many cases this would eliminate the most effective or the only effective reasonable accommodation.").

A seniority system provides a prime example of a policy that a company is entitled to respect. Although the ADA allows an employee to transfer to a vacant position, 42 U.S.C. § 12111(9)(B), Turpin has no statutory right to supercede Sara Lee's seniority system. The only factual twist in this case is that Turpin wants to retain the position she already has, rather than transfer to another job. This is a distinction without a difference. Turpin no longer had the seniority to hold that time-slot once the seniority of the Hartsville employees was factored in. Indeed, Turpin would vault over fellow workers who have twenty years more seniority if we required Sara Lee to suspend its policy.

The EEOC argues that Sara Lee's seniority program was not so well-entrenched as to constitute a uniform policy. The parties do not

dispute, however, that Sara Lee has maintained the policy for at least thirty years, and it has been in its present form for the last fifteen years. The workers at the company knew about the seniority policy and respected it. The seniority policy applies to priorities for shift changes and for filling vacant positions. It also determines the selection of employees for layoff and recall of laid-off employees. Indeed, the seniority policy applies to interplant transfers, noting that "[a]n employee transferred permanently between plants retains his/her Company seniority for all seniority purposes." The policy is a neutral and non-arbitrary method of resolving sensitive questions in the workplace. The policy allows all workers to know the rules of the game before a decision is made.

Although the seniority policy does not directly address plant closings, Sara Lee has almost always applied the policy in this situation. Indeed, Sara Lee applied the seniority policy to plant closings at seven different locations before the plant closing at issue in this case. To mandate that a company exempt workers from this long-standing policy would disrupt the legitimate expectations of Sara Lee's long-time employees. It could potentially expose the company to the threat of lawsuits by disgruntled employees who were placed behind employees in need of accommodation. *See, e.g., Small v. Springs Indus., Inc.*, 357 S.E.2d 452 (S.C. 1987) (in South Carolina, claim of breach of implied contract based on employer policies is available).

The EEOC acknowledges that if this policy were part of a collective bargaining agreement, granting an exception to Turpin would not be a reasonable accommodation. *See, e.g., Carter v. Tisch*, 822 F.2d 465, 467-68 (4th Cir. 1987) (Rehabilitation Act); *Smith*, 180 F.3d at 1175-76; *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996). No reason exists for creating a different rule for legitimate and non-discriminatory policies that are not a part of a collective bargaining agreement. All workers — not just those covered by collective bargaining agreements — rely upon established company policies. The ADA does not require employers to disrupt the operation of a defensible and non-discriminatory company policy in order to provide a reasonable accommodation.

Sara Lee satisfied its duty of reasonable accommodation by offering Turpin the options available to her under the seniority policy:

move to the second or third shift, be laid off with recall rights for twelve months, or take a severance package. The EEOC makes no allegation that the policy singles out Turpin because she was disabled. Turpin simply was unable to stay on the first shift because other employees had worked at Sara Lee for twenty years longer than she had. To hold that Turpin can violate the seniority rights of others in order to uphold her own rights under the statute would stand the ADA on its head.

All antidiscrimination statutes, from Title VII to the ADA, impose costs on employers. *See, e.g., EEOC v. Humiston-Keeling, Inc.*, 227 F.3d 1024, 1028-29 (7th Cir. 2000). The difference in this case is that requiring an employer to break a legitimate and non-discriminatory policy tramples on the rights of other employees as well. The ADA does not require employers to penalize employees free from disability in order to vindicate the rights of disabled workers. Indeed, Congress recognized the importance of honoring the rights of non-disabled employees when it defined "reasonable accommodation" to include "reassignment" only when a position is "vacant." 42 U.S.C. § 12111(9)(B). The ADA does not require reassignment when it would mandate that the employer bump another employee out of a particular position. *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996). Rather, an employer must be able to treat a disabled employee as it would any other worker when the company operates a legitimate, nondiscriminatory policy. A "contrary rule would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees." *Dalton*, 141 F.3d at 679. Accordingly, Sara Lee satisfied its duty of reasonable accommodation in this case.

## III.

The ADA has a vital and important role in protecting disabled persons. However, the statute does not protect individuals who do not have a substantial limitation on a major life activity. For those who are disabled under the statute, the ADA operates as a shield against discrimination; the statute is not a sword used to punish non-disabled

workers. The district court correctly perceived this statutory function, and for the foregoing reasons its judgment is

*AFFIRMED*.