**James Henry TODD, Plaintiff,**

v.

**ACADEMY CORP., Defendant.**

**No. CIV. A. 98–1620.**

United States District Court, S.D. Texas, Houston Division.

Aug. 5, 1999.

Joseph Y. Ahmad, Ahmad & Zavitsanos, Houston, TX, for Plaintiff.

Jess M. Irwin, III, Herring and Irwin, Austin, TX, for Defendant.

## ORDER

HITTNER, District Judge.

Pending before the Court is the Motion for Summary Judgment filed by defendant Academy Corp. ("Academy"). After reviewing the motion, the submissions, and the applicable law, the Court has determined that motion should be granted.

Plaintiff is a 42–year old male who has had epilepsy since he was 5 years old. Since the age of five, he has taken medication to control his epilepsy. Although the medication is successful in controlling the epilepsy, it does not cure it. Despite the medication, Plaintiff continues to have "light" seizures, which typically last from

five to fifteen seconds, at the rate of approximately one per week.[1] Plaintiff is able to recognize the onset of one of these "light" seizures and is then able to lie down in a separate location removing himself and others from potential danger. Plaintiff testified at his deposition that he suffered from approximately eight of these "light" seizures in the five months during which Plaintiff was employed by the Defendant. The Court notes, however, that in an affidavit submitted to the Equal Employment Opportunity Commission ("EEOC"), Plaintiff estimated the number of seizures he had at work to only three or four.

Plaintiff began working at Academy in September of 1996 as a stocker. His duties at Academy were to take merchandise off pallets, to put it in bins, and to use a scanner gun to inventory and stock the merchandise. He earned approximately $5.00 per hour. While employed in this position, Plaintiff had several supervisors. His immediate supervisor was Julie Quintana. Ms. Quintana's immediate supervisor was Kalpesh Patel, who was the operations manager for hard lines. Mr. Patel's supervisor was Al Powell. Mr. Powell was the Vice–President for Logistics and the manager of the Distribution Center in which Mr. Todd, Ms. Quintana, and Mr. Patel worked.

Within the first few weeks of being hired at Academy, Plaintiff suffered his first seizure at work. After this initial seizure, Plaintiff met with Mr. Patel and Mr. Powell to discuss the situation. In this meeting, Mr. Powell inquired about Plaintiff's condition. At that time, Plaintiff admitted that he suffered from epilepsy and

asked if it would be a problem. Powell stated that it would not be a problem and that Plaintiff should just "go on back to work." The only thing demanded of Plaintiff, in connection with his epilepsy, was he was required to inform Mr. Patel if he were to have a seizure. Soon after this meeting with Mr. Patel and Mr. Powell, Plaintiff conducted a meeting with Mr. Patel, Ms. Quintana, and all of his co-workers to inform them of his epilepsy and to give them instructions of what to do if he were to have a seizure at work.

Plaintiff was absent from work from February 10, 1997 through February 14, 1997. Upon Plaintiff's return to work on February 17, he was informed of his termination and the possibility of rehire upon reapplication. The reason given for his termination was that he violated the "failure to report to work policy." This work policy, as stated in the Defendant's employee manual provides that termination would result from an employee failing to report to work for "three consecutive days without notifying [his] supervisors." Plaintiff submitted an application for rehire but his application was rejected.

It is undisputed that on February 10 and February 11, 1997, Plaintiff suffered from the stomach flu which rendered him unable to attend work on those days. On each of those days, Plaintiff placed a phone call to Mr. Patel and left him a voice mail message informing him of his illness and unavoidable absence. It is also undisputed that Plaintiff was absent from work on the remaining days of that week and that Plaintiff called Mr. Patel each of those mornings and informed him via voice mail of his inability to work.[2] Defendant

---

1. Plaintiff testified at his deposition that his condition could also involve longer, more serious seizures but these seizures are well controlled by medication. Plaintiff did not suffer a single serious seizure during his five months at Academy.

2. The reasons of the absences later in the week differ in the parties' accounts of the facts. Plaintiff claims that from February 12–14, 1997 he was unable to attend work be-

cause he was suffering from seizures as a result of his vomiting his epilepsy medication. Plaintiff argues that but for his epilepsy he would have been back at work beginning February 12. Defendant argues that Plaintiff's entire absence was due to the stomach flu and therefore his termination had no relation to his epileptic condition. This debate is immaterial to the present matter due·to the fact that the Plaintiff is ultimately unable to satisfy

contends that while Plaintiff did not necessarily violate the policy as written, that Plaintiff violated a long-standing unwritten policy which provided for the termination of an employee who misses three consecutive days when he did not have sick or vacation leave, and the Family Medical Leave Act was not applicable to his absence.[3] Therefore, termination was appropriate and wholly unrelated to his condition.

In light of the Plaintiff's belief that the proffered reason given by the Defendant for his termination was mere pretext for discrimination, in May of 1998 Plaintiff, James Todd, filed suit against Academy alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA"). Plaintiff alleges he was subjected to different terms and conditions of employment, was terminated, and was refused rehire due to his suffering from a disability. Defendant subsequently filed the present motion for summary judgment claiming entitlement to judgment as a matter of law.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990).

The ADA proscribes that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, Plaintiff must show that:

(1) he suffers from a disability;

(2) he is a qualified individual for the job in question; and

(3) an adverse employment decision was made because of his disability.

*Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir.1999); *see also* 42 U.S.C. § 12112(a).[4] Should the plaintiff carry his burden, the burden would shift to the defendant to proffer a legitimate, non-discriminatory reason for its action. If satisfied, the burden shifts once again to the plaintiff to rebut the justification given by the defendant by demonstrating that the justification given was merely a pretext for discrimination. *Daigle v. Liberty Life Insurance Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

The threshold issue in a plaintiff's prima facie case of discrimination under the ADA is a showing that he suffers from a disability protected by the ADA. *Talk*, 165 F.3d at

the threshold element of his prima facie claim. Therefore, summary judgment is appropriate regardless of extraneous factual disputes.

**3.** Plaintiff claims that even if the unwritten policy exists as Defendant claims, it is a violation of the Americans with Disabilities Act because it does not reasonably accommodate Plaintiff's disability. This issue need not be addressed because, as will be discussed *infra*. Plaintiff is not considered to have a "disability" per the most recent Supreme Court decisions and therefore, his illness need not be reasonably accommodated.

**4.** There are two lines of cases within the Fifth Circuit concerning the elements a claim of discrimination under the ADA. The most recent Fifth Circuit decision in the area includes a fourth element: "replaced by a non-disabled person or treated less favorably than non-disabled employees." This element is framed in an "intentional discrimination" framework as dictated by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) as opposed to a "discrimination" claim under the ADA. Because this Defendant succeeds on summary judgment based on the first, threshold element, it is unnecessary to decide which framework is appropriate.

1024 (citing *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir.1996)). Under the ADA, a disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual...." 42 U.S.C. § 12102(2).[5]

■ The Supreme Court has promulgated a three-step process in determining whether plaintiff has a disability pursuant to the ADA. First, the court must consider whether the condition in question constitutes a physical impairment. Second, the court must identify the plaintiff's life activity and determine if it classifies as a "major life activity" under the ADA. Finally, the court must ask whether the plaintiff's impairment substantially limits the major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998); *Equal Employment Opportunity Commission v. R.J. Gallagher Company*, 181 F.3d 645, 652 (5th Cir.1999).

■ It is without question that Plaintiff suffers from a physical impairment within the meaning of § 12102(2). Plaintiff suffers from epilepsy which is defined as a "disorder of the nervous system, usually characterized by fits of convulsions that end with loss of consciousness." Random House College Dictionary 444 (Revised Ed.1984). Without medication, Plaintiff would suffer daily seizures, including grand mal seizures which involve loss of consciousness, general thrashing, and tonoclonic activity. Epilepsy qualifies as a physical impairment for the purposes of defining disability under the ADA requirements.

The life activity most applicable to the Plaintiff in the present case is working. The EEOC regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R.

§ 1630.2(I). Based on these guidelines, courts have concluded that working falls within the category of major life activities. *R.J. Gallagher Company*, at 652–53. In addition to working, Plaintiff identifies other life activities such as walking, talking, thinking and learning which are potentially affected by his epilepsy. It is uncontroverted that during a seizure Plaintiff is not able to work, walk, talk or think very clearly. It is also uncontroverted that the combination of the medication and the disease itself may cause a reduction in thinking capacity and a reduction in intellectual functioning. These additional life activities, upon which the Plaintiff relies, are also considered major life activities pursuant to the EEOC guidelines.

The third step in determining disability status is to determine whether the physical impairment results in a *substantial limitation* on the major life activities relied upon by the Plaintiff. The Court concludes that it does not. This element of the definition of disability has undergone serious changes in light of the recent Supreme Court opinion in *Sutton v. United Airlines, Inc.*, —— U.S. ——, 119 S.Ct. 2139, —— L.Ed.2d —— (1999). Prior to this decision, "the determination of whether an individual is substantially limited in a major life activity must be made...without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998) (describing 29 C.F.R. § 1630.2(j)). Based on this analysis, epilepsy would, without question, be considered a substantial limitation on several major life activities, and a person suffering from epilepsy would receive nearly automatic ADA protection.

■ However, on June 22, 1999, the Supreme Court made a significant change in ADA analysis. The Supreme Court in *Sutton* held that in evaluating persons in their "hypothetical uncorrected state is an impermissible interpretation of the ADA."

---

5. The ADA also defines a disability as a "record of such an impairment" or "being regarded as having such an impairment". 42 U.S.C. § 12102(2). Plaintiff does not utilize these definitions, therefore, they need not be addressed.

*Sutton,* —— U.S. at ——, 119 S.Ct. at 2146. This change in the evaluation of disability status modifies the analytical scheme of a discrimination claim under the ADA. The law, in light of this decision, now demands that "measures to correct for, or mitigate a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Id.* The inquiry has been transformed to a consideration of whether the condition, in its corrected or mitigated state, results in a substantial limitation on major life activities of an individual. An individual is now properly classified as having or not having a disability based on his life function under the influence of corrective or mitigating measures.

■■ The question of whether a particular impairment results in a substantial limitation of a major life activity is an individualized inquiry. *Sutton,* —— U.S. at ——, 119 S.Ct. at 2142. The definitions promulgated by the ADA require that disabilities "be evaluated 'with respect to an individual' and be determined based on whether an impairment substantially limits the 'major life activities of such individual.'" *Id.* (citing 42 U.S.C. § 12102(2)). Therefore, the disability status of a person under the ADA is determined on the basis of whether the particular ailment suffered by that person, in its corrected or mitigated state, is a substantial limitation on that particular person in his particular life situation.

■ In order to make such an individualized, case-by-case determination of whether the condition suffered by this Plaintiff in his medicated state is a substantial limitation on the major life activities relied upon by the Plaintiff in the

present claim, an in-depth factual analysis is necessary. In the present case, as discussed previously, Plaintiff suffers from epilepsy. Plaintiff "religiously" takes medication to control his condition. While medicated, which he has been consistently since the onset of his condition at age 5, Plaintiff only suffers from "light seizures," as opposed to seizures of the longer and more serious grand mal variety from which Plaintiff would suffer but for the medication. These light seizures typically last from five to fifteen seconds, approximately once a week, and are characterized by an aura effect, which means Plaintiff is aware of the seizure before it actually occurs. When Plaintiff feels the onset of the "light seizure," he removes himself and others from potential danger by leaving the area and laying down in a separate location. During the seizure, Plaintiff's thinking is "cloudy" but he is able to hear and see people but is unable to speak. Plaintiff testified in his deposition that when the seizure is in full effect, he experiences a left side tremor which has a "small shake to it and then it's over with." This description is the extent of the limitation on Plaintiff's ability to work, walk and talk. He is limited in these particular life functions a maximum of fifteen seconds per week and only eight times in the five months he was employed by Defendant.[6] There is no indication that he is unable to perform the functions of his job as a result of his epilepsy or that he creates a dangerous situation in the workplace or any place else.

In addition to the limitation described above, Plaintiff's only further restriction is to refrain from drinking alcohol because of his medication.[7] In his medicated state, which is now the appropriate state in which to determine the status of a disability, Plaintiff only suffers from momentary

---

6. As noted earlier, in an affidavit submitted to the EEOC, Plaintiff estimated the number of seizures he experienced at work at only three or four.

7. Plaintiff's physician, Dr. Swick also recommends he not swim alone or operate heavy machinery, such as a car, if he is experiencing "absence spells". At the time of the lawsuit, Plaintiff was not restricted from driving.

physical limitations which could not be classified as substantial.

As mandated by the Supreme Court in *Sutton*, a court must not only take into account the positive ramifications of mitigating or corrective measures, but also the negative. *Sutton*, —— U.S. at ——, 119 S.Ct. at 2142. Plaintiff contends that the side effects of his medication create a substantial limitation on his major life functions of thinking and learning. The side effects upon which Plaintiff focuses are the decreased intellectual functionings that can be associated with epilepsy and anti-epileptic medication.[8] The potential decrease in intellectual functioning associated with Plaintiff's condition and medication may be characterized by lowered IQS and a reduced capacity to accomplish complex tasks. As discussed previously, the determination of whether a physical ailment results in a substantial limitation on a major life activity is an individualized, case-by-case inquiry. *Id.* Therefore, it is necessary to determine if the decrease in intellectual functioning potentially suffered by this Plaintiff is a substantial limitation on his particular life functions.

Although thinking and learning are major life functions and epilepsy and anti-epileptic drugs have been known to potentially create limitations on these particular life functions, it is not clear from the evidence presented that this Plaintiff has experienced a substantial limitation on these functions. Plaintiff's physician testified that he had a general impression that Plaintiff's "ability to interact and knowledge base is somewhat lessened" for someone his age. This general impression was made after one interview and was based on quality of speech patterns and "general intellectual functioning." The only reference made to specific limitations as to this particular Plaintiff in this area was that the Plaintiff was "somewhat" limited.

The only other evidence concerning the negative side effects of epilepsy and anti-

epileptic medication on thinking and learning capabilities was presented in a general, hypothetical manner and not as it relates to Plaintiff's individual capacities. The Supreme Court has made it abundantly clear that "a person be presently—not potentially or hypothetically—substantially limited." *Id.* at 2146. Although his medication and condition may have adverse effects on Plaintiff's intellectual capacity, it is not clear from the evidence presented that these effects are actually, not merely hypothetically, substantial. Plaintiff is clearly able to answer questions intelligently concerning his condition and situation and perform the tasks and duties associated with his job and daily life.

Even assuming that this Plaintiff has experienced some adverse effects on his intellectual functioning, as briefly described by his physician, there is no evidence that his decreased intellectual functioning has substantially limited his abilities to work or care for himself in any way. In fact, Plaintiff's physician testified that he saw no reason for Plaintiff not to continue to work in the capacity for which he was hired by the Defendant.

Except for a time period of fifteen seconds per week, this Plaintiff is able to work, walk, talk, think and learn. As a result, Plaintiff did not suffer from substantial limitations on these major life activities. Plaintiff's physical ailment does not result in a substantial limitations on the major life activities upon which he relies. Therefore, he cannot be considered "disabled" under the ADA. Because Plaintiff cannot be classified as suffering from a disability, he is not able to satisfy the threshold element of a claim under the ADA. It is therefore

ORDERED that the Motion for Summary Judgment is GRANTED.

---

**8.** Plaintiff also mentions decreased energy and sleeplessness. However, these side ef-

fects are not the focus of Plaintiff's claim and need not be addressed herein.