# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-2679/2680

_____

| | | |
|---|---|---|
| Rhonda Otting, | * | |
| | * | |
| Appellant/Cross-Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| J. C. Penney Company, | * | |
| | * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: March 16, 2000

Filed: August 3, 2000

_____

Before MCMILLIAN, FLOYD R. GIBSON, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

FLOYD R. GIBSON,  Circuit Judge.

A jury awarded Rhonda Otting compensatory and punitive damages on her discrimination claim against J. C. Penney pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 (1994).  Following the jury's verdict, J. C. Penney moved for judgment as a matter of law (JAML), or in the alternative, for a new trial, pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure.  The district court granted J. C. Penney's motion for JAML as to the punitive damage award but denied the remainder of the motion.  Otting appeals the district court's order striking the

punitive damages award. J. C. Penney cross-appeals the district court's denial of its motion for JAML on the issue of liability and challenges several rulings of the district court. We affirm in part, reverse in part, and remand.

## I.  BACKGROUND

At the time of trial, thirty-three year old Rhonda Otting suffered from epilepsy. Otting's epilepsy developed in 1983 as a result of a softball injury.[1] Thereafter, despite medication, Otting suffered epileptic seizures of varying severity two or three times monthly. Subsequent to the onset of her epilepsy, Otting graduated from high school and held a series of sales associate positions, as well as one assembly line position.

J. C. Penney hired Otting on September 1, 1994, as a part-time sales associate in the Fine Jewelry Department. At the time she was hired, Otting informed J. C. Penney that she was epileptic. Between September of 1994 and October of 1995, in addition to the Fine Jewelry Department, Otting worked in the Home Furnishings, Children's, and Women's Departments. As a part-time sales associate working twenty-five hours per week, Otting was eligible for J. C. Penney's benefits package, which included health insurance and short- and long-term disability benefits.

In October of 1995, Otting and her treating physician, Dr. Mark Granner, decided to explore brain surgery as a potential treatment for her epilepsy. Because Otting suffers from focal- or localization-related epilepsy[2], her doctors first attempted to assess from which portion of her brain the problem originated. In order to make this assessment, Otting was hospitalized for approximately two weeks while the doctors

---

[1]When she was seventeen years old, Otting was hit on the right-hand side of her skull by a line-drive softball.

[2]Focal- or localization-related epilepsy is a form of epilepsy that produces seizures from a specific area of the brain, rather than from the entire brain.

tapered off her anti-seizure medications and attempted to induce seizures. Otting applied for, and J. C. Penney granted, a medical leave of absence during this period.

Otting returned to work in the Housewares Department on October 17, 1995. One month later, Otting applied for and received another short-term disability leave of absence. Otting was on disability leave from November 17, 1995, to January 22, 1996. During this time, she underwent in-patient brain surgery to remove a small section of her right frontal lobe. On January 22, 1996, Otting returned to work at J. C. Penney. Rather than returning Otting to her previous position in Housewares, J. C. Penney placed her in the Shoe Department following her return from surgery.

Otting's duties as a sales associate in every department in which she had worked were essentially identical. Those duties included ringing up sales, completing paperwork, and the movement of merchandise. Her position in the Shoe Department consisted of these same duties with one exception: as a sales associate in the Shoe Department, Otting was required to climb a ladder to retrieve stocked shoes. Between January and May of 1996, Otting worked in the Shoe Department with no apparent difficulties, although she continued to suffer from epileptic seizures. She received a satisfactory performance review during the period, as well as a customer service award.

On May 29, 1996, Otting again applied for, and J. C. Penney approved, a short-term disability leave. Neither the brain surgery or medications had succeeded in controlling Otting's epilepsy. During the summer months of 1996, Otting and her doctor altered her medication regimen in an attempt to control the seizures. Throughout the summer, Otting's seizures gradually lessened in frequency. Although her seizures were not entirely under control, Dr. Granner released Otting to return to work on September 17, 1996. Dr. Granner's work release included one restriction; that Otting not climb ladders until she had been seizure-free for six months.

In early September, Otting called J. C. Penney's personnel manager, Joanne Hildebaugh, and informed her that she would soon be receiving her release to return to work. When Otting told Hildebaugh of the temporary ladder-climbing restriction, Hildebaugh informed her that she could not return to work if she had any restrictions. On September 20, 1996, Otting called Mr. Tom Morris, the store manager, regarding her desire to return to work. Morris reiterated Hildebaugh's statement that Otting could not return to work while under a restriction.

Following this phone call, Otting went to the store to meet with Morris in person. Otting informed Morris again of her desire to return to work. As the ladder-climbing requirement was unique to the Shoe Department, Otting inquired about the availability of positions in any department other than Shoes. Morris again stated that Otting could not return to work while she was under a restriction. Otting was terminated on September 20, 1996, and informed that she would be receiving a long-term disability benefits package from J. C. Penney. She was further advised that she could apply for Social Security disability benefits.

Between the time of her termination and early November of 1996, Otting continued to suffer seizures. During the same time period, J. C. Penney hired two full-time sales associates in the Men's and Children's Departments. Neither of the new employees suffered from a disability. J. C. Penney did not offer either of these positions to Otting.

Otting brought suit against J. C. Penney in Iowa state court in May of 1997, alleging J. C. Penney had violated the ADA and the Iowa Civil Rights Act by terminating her. J. C. Penney subsequently removed the case to federal court. Prior to trial, Otting dismissed her Iowa Civil Rights Act claim. On January 15, 1999, following a five-day trial, the jury returned a verdict in favor of Otting. The jury awarded Otting $28,390.40 in compensatory damages and $100,000.00 in punitive damages. The district court partially granted J. C. Penney's motion for JAML by

striking the jury's punitive damages award. Otting appeals the district court's order and J. C. Penney cross-appeals.

## II.    DISCUSSION

### A.    Disability Determination

In its cross-appeal, J. C. Penney contends that the district court erred in denying its motion for JAML on the issue of liability because Otting is not disabled as defined by the ADA. Were we to agree with J. C. Penney's contention that Otting is not an individual protected by the ADA, Otting's appeal would be moot. We therefore address this potentially dispositive issue first.

We review a district court's denial of a motion for JAML de novo. See Browning v. Liberty Mutual Insurance Co., 178 F.3d 1043, 1047 (8th Cir.), cert. denied, 120 S. Ct. 588 (1999). JAML is proper when there is insufficient evidence to support the jury's verdict. See Buckles v. First Data Resources, Inc., 176 F.3d 1098, 1100 (8th Cir. 1999); Fed. R. Civ. P. 50(a)(1). "In making this determination, we view all facts and resolve any conflicts in favor of [Otting], giving [her] the benefit of all reasonable inferences." Buckles, 176 F.3d at 1100.

To establish a prima facie claim under the ADA, Otting is required to show that: 1) she is disabled as defined by 42 U.S.C. § 12102, 2) she is qualified to perform the essential functions of the employment position, with or without reasonable accommodation, and 3) she has suffered an adverse employment action because of her disability. See Gutridge v. Clure, 153 F.3d 898, 900 (8th Cir. 1998), cert. denied, 119 S. Ct. 1758 (1999). J. C. Penney argues that, as a matter of law, Otting fails to meet the first prerequisite of a successful ADA claimant, i.e. she is not disabled as defined by the ADA.

The ADA defines "disability" as: "A) a physical or mental impairment that substantially limits one or more of the major life activities . . . ; B) a record of such an impairment; or C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). For the purposes of this case, we need only address the definition contained in subsection A. The Equal Employment Opportunity Commission (EEOC) has issued regulations defining the three elements of disability contained in subsection A. See 29 C.F.R. § 1630.2 (1999). "Physical or mental impairment" is defined as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). "Major Life Activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means an individual is "[u]nable to perform[, . . .] or [is s]ignificantly restricted as to the condition, manner or duration under which [he] . . . can perform[, . . .] a major life activity . . . which the average person in the general population can perform . . . ." 29 C.F.R. § 1630.2(j)(1).

The crux of J. C. Penney's argument is that, on the date of Otting's discharge, her epilepsy did not substantially limit her ability to engage in any major life activity. Although J. C. Penney concedes that Otting's epilepsy is a physical impairment, it contends that impairment does not substantially limit a major life activity. In support of its argument, J. C. Penney relies heavily upon the Supreme Court's recent decision in Sutton v. United Airlines, Inc., __ U.S. __, 119 S. Ct. 2139 (1999)[3]. In Sutton, the

---

[3]Sutton concerned two pilots with severe myopia who applied for employment with United Airlines as commercial airline pilots. The pilots' uncorrected visual acuity was 20/200 or worse in each eye. With the aid of corrective lenses, however, the pilots' eyesight was 20/20 or better. United Airlines' minimum vision requirement for

Supreme Court held that the determination of whether a person is disabled under the ADA should be made on an individual basis with reference to corrective measures taken by the person to ameliorate the effects of the impairment. See Sutton, __ U.S. __, 119 S. Ct. at 2149.

Prior to the Supreme Court's decision in Sutton, many courts of appeal, including our own, had followed the EEOC's interpretative guidelines which accompany the regulations. Specifically, 29 C.F.R. pt. 1630, App. § 1630.2(j) states that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." See, e.g., Doane v. City of Omaha, 115 F.3d 624, 627 (8th Cir. 1997)(stating "our analysis of whether [plaintiff] is disabled does not include consideration of mitigating measures"). The Sutton Court held that the approach reflected in the EEOC's interpretative guidelines was an "impermissible interpretation of the ADA." Sutton, __ U.S. __, 119 S. Ct. at 2146. Rather, the Court held that a person has a disability under Subsection A of 42 U.S.C. § 12102 if "notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity." Id. at 2149.

While Sutton certainly changed the landscape of ADA litigation in some respects, we do not find Otting's case to be particularly affected by the Supreme Court's recent pronouncements. In recognizing that "individuals who take medicine to lessen the symptoms of an impairment so that they can function [may] nevertheless remain substantially limited" in a major life activity, and thus disabled, we believe the Sutton Court addressed the situation that currently confronts us. Sutton, __U.S.__, 119 S. Ct.

---

employment was an uncorrected visual acuity of 20/100 or better. As such, the pilots were informed by United that they were not eligible for employment with the airline. The pilots sued, claiming United had discriminated against them in violation of the ADA.

at 2149. Further, we note that, as this case went to trial several months before the Supreme Court decided <u>Sutton</u>, the record is not as fully developed as it might be regarding the effects of Otting's impairment as treated with medication. Nonetheless, the record clearly indicates that, despite surgery and medication, Otting's seizures were not under control at the time of her termination.

According to testimony at trial, when J. C. Penney terminated Otting she continued to regularly suffer epileptic seizures. Otting's seizures, although sporadic, occurred frequently enough that she was prohibited by law from driving and could not take baths by herself for risk of drowning if a seizure occurred. When, approximately two or three times monthly, Otting suffered a seizure, she became unable to see, hear, speak, walk or work. The seizures lasted between 30 seconds and two minutes. Following a seizure, Otting would be lethargic, shaky, and have difficulty concentrating. Depending upon the severity of the seizure, the after-effects lasted between ten minutes and thirty-six hours.

That epilepsy is a physical impairment is not disputed by the parties. However, J.C. Penney claims that when it decided to discharge Otting, she was not, as medicated, substantially limited in a major life activity. The only activity which Otting was prohibited from performing was ladder-climbing. Climbing ladders, J. C. Penney argues, is not a major life activity for the purposes of the ADA. We agree that ladder-climbing is not a major life activity, <u>see</u> <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 914 (8th Cir. 1999), <u>cert. denied</u>, 120 S. Ct. 794 (2000) (finding that walking up stairs is not a major life activity for the purposes of ADA). Nonetheless, we disagree with J. C. Penney's contention that ladder-climbing is the only activity which should be considered when determining whether Otting is disabled. Otting testified that during her seizures she could not speak, walk, see, work, or control the left side of her body. We hold that it is these major life activities, not the activity of ladder-climbing, which should be considered in determining Otting's status under the ADA.

We note the Supreme Court's statement in <u>Sutton</u> that "whether a person has a disability under the ADA is an individualized inquiry." <u>Sutton</u>, __ U.S. __, 119 S. Ct. at 2147. Moreover, we are mindful of recent Supreme Court pronouncements on the issue of whether an individual is substantially limited in a major life activity. In <u>Bragdon v. Abbott</u>, the Court stated "[t]he [ADA] addresses substantial limitations on major life activities, not utter inabilities." 524 U.S. 624, 641 (1998). The <u>Bragdon</u> Court also noted that when an individual's impairment created significant limitations, the ADA definition of disability is met even if the difficulties created by the impairment are not insurmountable. <u>See</u> <u>id</u>.

In considering the record as a whole and the effects of Otting's impairment, we find that at the time of her termination, Otting's epilepsy substantially limited one or more major life activities.[4] Despite her attempts to control her impairment with

_____

[4]Although several district courts across the country have considered the issue of whether epileptics are disabled for the purposes of the ADA in the period since the Supreme Court decided <u>Sutton</u>, no other courts of appeal have yet reached the issue. While the majority of the district courts have concluded that the claimants concerned were not disabled in light of <u>Sutton</u>, our review of those decisions reveal that most are inapposite to the case at hand because the claimant's epilepsy was either completely controlled by medication or the claimant's seizures were considerably less severe and frequent than Otting's. <u>See</u> <u>Arnold v. City of Appleton, Wisconsin</u>, 97 F. Supp.2d 937 (D. Wis. 2000) (stating that ADA claimant whose epilepsy had been under control through medication for 19 years is not actually disabled in light of <u>Sutton</u>); <u>Moreno v. American Ingredients Company</u>, 2000 WL 527808 (D. Kan. April 7, 2000) (holding that ADA claimant who suffered an epileptic seizure approximately once every month to two months is not substantially limited in the major life activity of working); <u>Popko v. Pennsylvania State University</u>, 84 F. Supp.2d 589 (M.D. Pa. 2000) (finding that claimant whose epilepsy is completely controlled by an appropriate amount of sleep is not disabled); <u>Treglia v. Town of Manlius</u>, 68 F. Supp.2d 153 (N.D. N.Y. 1999) (stating that claimant who admitted epilepsy was under control through medication and did not allege that epilepsy substantially limited any major life activities is not disabled under 42 U.S.C. § 12102(2)(A)); <u>Todd v. Academy Corp.</u>, 57 F. Supp.2d 448 (S.D. Tex. 1999) (finding that claimant who suffered eight "light" seizures, lasting

-9-

medication, at the time she was terminated, Otting met the definition of disabled found in 42 U.S.C. § 12102(2)(A).  That is, Otting suffered from a physical impairment which substantially limited the  major life activities of walking, seeing and speaking.

In making this determination, we have considered the factors delineated in the EEOC regulations for determining whether an individual is substantially limited in a major life activity:  "i)[t]he nature and severity of the impairment; ii) [t]he duration or expected duration of the impairment; and iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).  We note that Otting's epilepsy is severe and has been resistant to attempts at control.  Further, due to the nature of Otting's impairment, when she suffers a seizure she is rendered entirely incapable of speaking, walking, and seeing. Additionally, Otting's impairment is most likely permanent.

In light of the foregoing discussion, we affirm the district court's denial of J. C. Penney's motion for JAML on the issue of liability.

## B.     Punitive Damages

We next address Otting's contention that the district court erred in partially granting J. C. Penney's motion for JAML by striking the jury's award of punitive damages.  We review a district court's grant of JAML de novo and will affirm "[o]nly when there is a complete absence of probative facts to support" the jury's verdict.

---

approximately fifteen seconds each, over a five month period was not disabled under the ADA).  But see Rowles v. Automated Production Systems, Inc., 92 F. Supp.2d 424 (M.D. Pa. 2000) (finding that epileptic claimant met ADA definition of disabled even though his seizures were under control medically because precautions undertaken by the claimant combined with effect of infrequent seizures constituted a substantial limitation on several major life activities).

-10-

Blackmon v. Pinkerton Security & Investigative Services, 182 F.3d 629, 635 (8th Cir. 1999)(internal quotations omitted).

Punitive damages are available to ADA claimants who suffer intentional discrimination by an employer acting "with malice or with reckless indifference to the federally protected rights of [the claimant]." 42 U.S.C. § 1981a(b)(1) (1994). The Supreme Court recently addressed the meaning of the terms "malice" and "reckless indifference" as they relate to the standard for punitive damages in employment discrimination cases. See Kolstad v. American Dental Assoc., __ U.S. __, 119 S. Ct. 2118 (1999). The Court stated that "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 2124. An employer who "discriminate[s] in the face of a perceived risk that its actions will violate federal law [may] be liable in punitive damages." Id. at 2125. The Court further explained that, although conduct justifying a punitive damages award is sometimes characterized as egregious or outrageous, it "is not to say that employers must engage in conduct with some independent, 'egregious' quality before being subject to a punitive award." Id. at 2126.

Our review of the record, enlightened by the Supreme Court's recent pronouncements, leads us to conclude that sufficient evidence was presented to support the jury's determination that J. C. Penney acted with malice or reckless indifference to Otting's federally protected rights under the ADA. J. C. Penney's store manager, Mr. Morris, and the store's personnel manager, Ms. Hildebaugh, each testified that it was J. C. Penney's company policy not to allow employees with any restrictions to return to work. Further, Morris testified that, although he was aware that federal law imposed upon him, as an employer, a duty to attempt to accommodate the restrictions of disabled individuals, he made no effort whatsoever to explore any possibility that would allow Otting to return to work with her ladder-climbing restriction. In her meeting with Morris on the date of her termination, Otting specifically asked if she

-11-

could be transferred to a department other than Shoes for the duration of her ladder-climbing restriction. Morris testified that, rather than exploring ways in which Otting's ladder-climbing restriction could be accommodated, he terminated Otting and told her to apply for Social Security. In light of the Supreme Court's statement in Kolstad that the "malice" and "reckless indifference" pertain to an employer's knowledge that it may be acting in violation of federal law, we conclude that a jury could reasonably have found J. C. Penney liable for punitive damages.

Thus, we find the district court erred in granting JAML on the punitive damages issue and hereby remand the case to the district court with directions to reinstate the punitive damages award.

## C.    Jury Instructions and Evidentiary Issues

J. C. Penney raises several other issues in its cross-appeal. In its most substantive argument, J. C. Penney contends that, in light of Sutton, the district court submitted an erroneous jury instruction. We review jury instructions for an abuse of discretion and "will reverse only if we find that the jury instruction contained an error or errors that affected the substantial rights of the parties." Kim v. Nash Finch Co., 123 F.3d 1046, 1057 (8th Cir. 1997) (internal quotations omitted). "[O]n review [we] must determine simply whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Id. (internal citations and quotations omitted).

Instruction No. 11, of which J. C. Penney complains, is largely a defining instruction. That is, the instruction simply states the provision of the ADA which Otting claims J. C. Penney violated and defines the terms used in the statute. The instruction utilizes the EEOC regulations to define the terms "disability," "major life activity," and "qualified individual with a disability." The final paragraph of the instruction states:

The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has but instead is based on the effect of that impairment on the life of the individual. An impairment is substantially limiting if it significantly restricts the duration, manner or conditions under which an individual can perform a particular major life activity, as compared to the ability to perform of the average person in the general population.

Appellee's App. at 11. J. C. Penney contends that because the Supreme Court held in Sutton that the disabled status of an individual should be determined with reference to corrective measures, Instruction 11 is erroneous. While we agree that the instruction failed to state that the ameliorative effects, if any, of corrective measures should be taken into account when determining whether an individual is disabled, we do not find that this instructional error affected J. C. Penney's substantial rights.

In light of the evidence presented at trial, Instruction No. 11 fairly and adequately submitted the issue of disability to the jury. Although Dr. Granner testified as to the effects of epilepsy on Otting when she was unmedicated, ample evidence was presented at trial to illustrate that Otting's epilepsy was not under control despite her medication. Had the jury been instructed to consider the ameliorative effects of Ms. Otting's medication, we have no trouble finding that they would have reached the same verdict. As such, we find any error in the instruction to be harmless. See Gile v. United Airlines, Inc., 2000 WL 656348 (7th Cir. May 22, 2000) (finding pre-Sutton jury instruction in which district court specifically instructed jury not to consider mitigating measures to be harmless error); Stolzenburg v. Ford Motor Co., 143 F.3d 402, 406 (8th Cir. 1998) (finding jury instruction error harmless when language of instruction did not do substantial violence to, nor find complete support in, circuit caselaw).

Finally, J. C. Penney challenges several additional rulings, including a second jury instruction, the district court's refusal to submit a jury instruction and several

evidentiary rulings. We review these decisions by the district court for an abuse of discretion. See Kim, 123 F.3d at 1057 (stating district court's formulation of jury instructions is reviewed for abuse of discretion); Allen v. Entergy Corp., Inc., 193 F.3d 1010, 1015 (8th Cir. 1999) (stating district court's evidentiary rulings are reviewed for an abuse of discretion). Having reviewed J. C. Penney's contentions under the appropriate standard, we find no abuse of discretion in the challenged rulings of the district court.

## III.   CONCLUSION

In sum, we affirm the district court's denial of J. C. Penney's motion for JAML on the issue of liability. We reverse the district court's grant of J. C. Penney's motion for JAML on the issue of punitive damages. We remand the case to the district court with directions to reinstate the jury's punitive damage award. In all other aspects, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-