**Ronald P. RUNKLE, Plaintiff,**

v.

**John E. POTTER, Postmaster General, United States Postal Service, Defendant.**

No. 02–CV–70418–DT.

United States District Court, E.D. Michigan, Southern Division.

June 23, 2003.

Paul Johnson, Esq., Rochester, for plaintiff.

Richard Rampage, Esq., Chicago, IL, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

The above-captioned Rehabilitation Act disability discrimination action is presently before the Court on Defendant's Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion to which Response Defendant has replied. Having reviewed and considered Defendant's Motion and the parties' respective briefs and supporting documents, and having heard the oral arguments of counsel on June 19, 2002, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

### II. PERTINENT FACTS

Plaintiff Ronald Runkle is an employee of the United Sates Postal Service. Runkle was first employed by the Postal Service in 1990 as a "casual" employee.[1] On October 14, 1995, Plaintiff received a career appointment as a PS–05 Part Time Flexible[2] Parcel Post Clerk, assigned to the Detroit Bulk Mail Center (the "BMC") in Allen Park, Michigan.

Prior to his employment as a casual employee in 1990 and again prior to being hired as a career part-time flexible employee in 1995, Plaintiff advised the Postal Service that he suffers from epilepsy and a seizure disorder and that he was taking depkote, an anti-convulsive medication, to control the seizures. [*See* Plaintiff's Ex. 3 and 5.]

Mr. Runkle's seizure disorder originated in 1976 when he hit his head while playing football. He suffered his first seizure shortly after this injury. *See* Plaintiff's Ex. 16. In 1977, Runkle was hospitalized for repeated grand mal seizures. *See* Plaintiff's E. 10 and 13. In 1984, he was again hospitalized for grand mal seizures. *Id.* During this 1984 seizure, Plaintiff suffered respiratory arrest and his heartbeat was temporarily lost. *See* Plaintiff's Ex. 14. However, he has not suffered respiratory arrest or had a grand mal seizure since that time.

Nonetheless, Mr. Runkle has been under the continuous care of neurologists and internists since 1977, and the evidence of record is that since 1984, his seizure disorder has been controlled by medication. Since that time, Mr. Runkle has had only occasional twitching of his chin or arm and jerking of his legs at night, and periodic "staring" spells when he may be "out of it" for a few seconds, after which he does not know what happened and is confused. *See* Plaintiff's Ex. 11, 12, 14, 16. These brief

---

1. "Casual" employees are defined as "non-bargaining unit employees that have a non-career appointment not to exceed two 90–day terms of employment in a calendar year and for no more than 21 days during the Christmas period." [*See* Plaintiff's Ex. 6.] These employees are used as a supplemental workforce in accordance with Postal Service collective bargaining agreements. *Id.*

2. The Postal Service's permanent career workforce is composed of four employee classifications: full-time regular schedule, part-time regular schedule, full-time flexible schedule and part-time flexible schedule. Part-time flexible schedule employees are "employees available to work flexible hours as assigned by management during the course of a service week." [*See* Plaintiff's Ex. 6.]

spells, referred to by some of his doctors as "focal" seizures, happen about two or three times per month, *id.*, and with medication, Plaintiff has not had a grand mal seizure since 1984.

As a result of his seizure disorder, Plaintiff's doctor, Dr. Ralph Raper, M.D., has prescribed that he maintain a regular sleeping schedule between the hours of 12:00 a.m. and 7:00 or 8:00 a.m. and not drink alcohol. [Plaintiff's Ex. 15; Defendant's Ex. 22.][3] According to Dr. Raper, Plaintiff's condition is exacerbated by sleep deprivation and flashing lights. *See* Ex. 15.

When Plaintiff started work at the Bulk Mail Center in 1995, he was placed on "Tour 1," which is the midnight shift.[4] Plaintiff was on this shift for only two or three weeks when he requested, and was granted, a reassignment to Tour 2, the day shift. *See* Plaintiff's Dep., Plaintiff's Ex. 18, p. 75. In December 1995, Plaintiff saw his doctor, Dr. Raper, and told him about his new job as a part-time flexible bulk mail clerk. Dr. Raper expressed concern regarding Runkle working the midnight shift because he believed that uninterrupted nighttime sleep was important to control Plaintiff's seizure disorder. *See* Plaintiff's Ex. 19. On January 11, 1996, Dr. Raper wrote to Plaintiff's employer and requested that Plaintiff not be required to work the midnight shift. *See* Plaintiff's Ex. 15. Dr. Raper explained:

> Mr. Ronald Runkle has been under my professional care since 1989. He suffers from a seizure disorder which dates back to 1976 perhaps related to head trauma in the distant past. His seizures have been reasonably well controlled in recent years on Depkote, an anticonvulsant medication. Unfortunately, several factors can lower the seizure threshold and make seizures more likely for Mr. Runkle. These circumstances include flashing lights such as a strobe light or sleep deprivation.
>
> Mr. Runkle recently consulted me regarding shift work. He informed me that his employer, the U.S. Postal Service, wishes for him to work midnights at times. It is my professional judgment that working midnights might be harmful to Mr. Runkle's health as it would likely produce sleep disturbance and lower his seizure threshold making it more likely for him to experience breakthrough seizures. In view of this, I have told him to avoid working midnights if at all possible.
>
> If any further information is required regarding this matter, please do not hesitate to contact me at the above office address or telephone me at (313) 287–7733 during my office hours.

[Plaintiff's Ex. 15.]

The Postal Service adhered to Dr. Raper's recommendation, and from January 1996 until January 2001, assigned Plaintiff only to Tour 2, the day shift, and Tour 3, the afternoon shift.

Meanwhile, in July 2000, the Detroit BMC underwent a major Tour realignment that included changing the tours of duty and non-scheduled days of various employees. [*See* Deposition of Efrain Al-

---

**3.** A number of doctors have examined Plaintiff in connection with this action. All of them, including a neurologist, Dr. Anthony Emmer, whose independent medical evaluation of Plaintiff was requested by the Post Office Medical Officer, recommended not only that Plaintiff work only the day shift, but also that Plaintiff not bathe in a tub alone, not swim alone, and not lift heavy equipment. *See* Plaintiff's Ex. 11, 12, 14, 16 and 17.

**4.** Tour 1 starts and 12:00 a.m. and ends at 8:30 a.m.. Tour 2 is the day shift. It starts at 8:00 a.m. and ends at 4:30 p.m. Tour 3 is the afternoon shift. It starts at 4:00 p.m. and ends at 12:30 a.m.

varado, Jr., Tour 2 Manager of Distribution Operations, Defendant's Ex. 24, p. 51.] Prior to that realignment, BMC utilized part-time flexible employees on all three Tours. *Id.* at p. 47. However, even though it was operating on all three Tours, the BMC was still failing to meet its operating plan. *Id.* at p. 51. Management, therefore, conducted a mail arrival profile to determine how and when the mail arrived at the Detroit BMC for processing so that they could then schedule the workforce to meet the daily operating plan. *Id.* at p. 52.

The mail arrival profile showed that the end of the mail processing day occurred with the initial dispatch of mail at 5:00 p.m. *Id.* Recognizing that 5:00 p.m. was the technical end of the processing day, management then looked to see where to place its resources so that the greatest amount of mail was processed in time for the initial 5:00 p.m. dispatch. *Id.* at pp. 52–53.

Management decided to convert Tour 1, the midnight shift, from a small tour to a major tour, as well as upgrade Tour 2 with additional regular positions. *Id.* at p. 53. Management also decided to scale back the operations on Tour 3, the afternoon shift, and make it a "mini-tour" responsible soley for dispatching and off-loading. *Id.* Management decided that to make the Detroit BMC operationally efficient, would require that most of the mail processing be done on Tour 1, and that all part-time flexible employees needed to be assigned to Tour 1 to cover the bulk of the entry and processing of the mail. *Id.* at pp. 66, 69, 80.

Accordingly, on January 5, 2001, Ephrain Alvarado, Jr., Tour 2 Manager of Distribution Operations at the Detroit BMC, sent Plaintiff Runkle a three-sentence letter notifying him that he was to report to Tour 1 effective January 13, 2001. *Id.* at p. 58; *see also* Defendant's Ex. 4. That letter stated only as follows:

This letter is to notify you that effective Saturday, January 13, 2001 at 12:00 Midnight, you are to report to Robert Davids, Tour 1 MDO for your assignment.

Management can no longer accommodate your request for a tour change at this time.

If you have any further questions or request regarding a tour change, pleas addressed [sic] them with complete documentation to Stephanie McCarthy, Plant Manager.

[Defendant's Ex. 4.]

Runkle responded by sending Ms. McCarthy a letter on January 8, 2001 requesting accommodation for his seizure disorder:

Dear Ms. McCarthy:

As management is well aware, I have a disability. I have a seizure disorder and my doctor has written letters and has also talked to management concerning this problem. He has advised management that I cannot work between the hours of 11:00 at night and 6:00 in the morning. Approx[imately] 8 months ago, my doctor, Dr. Ralph W. Raper, talked to Mr. Efrain Alvarado about my situation over the phone. Subsequent to that Tony, the Lead MDO at the time allowed me to come on days to help with the disability I have.

Just recently, January 5th, 2001, I received a letter stating that I would have to go to tour I as of January 13th, 2001. Because of my disability I cannot work the midnight shift, as my doctor has repeatedly stated.

In view of this fact, and because I am covered under the rehabilitation act of 1973 I am requesting an [sic] resonable [sic] accomodation [sic] to allow me to continue working on days like I have for the past several months. There is no "undue hardship" on the post office by

allowing me to do this. I have outstanding work attendance as well as an outstanding work ethic, I give 150% each day I'm here. You just need ask Miss Pat Allen or Tony Alvarado.

I would just like to come to work each day, do my job to the best of my ability, despite the disability that I have and not be *harassed* about having to go on a midnight tour when management knows very well that I cannot work on that shift because of the many letters and the phone call that my doctor, Dr. Ralph W. Raper made to Mr. Alvarado several months ago.

I look forward to hearing from you in the very near future.

[Defendant's Ex. 6.]

Ms. McCarthy also received a letter from Dr. Raper in which he explained to Ms. McCarthy Plaintiff's history of seizures, his treatment of Mr. Runkle, and the circumstances, including sleep disturbance, which would make seizures more likely for Plaintiff. He further explained to Ms. McCarthy:

I have advised [Mr. Runkle] of the importance of maintenance of normal sleep physiology. Because of disturbances in sleep physiology seen in workers on midnight shifts, I have strictly advised him to avoid working between the hours of 11:00 p.m. and 6:00 a.m. and to make that a regular sleep time. This is vital to him for avoidance of sleep deprivation which can lower his seizure threshold and possible evoke uncontrolled seizures once again.

In view of his medical condition, I do not feel that it is advisable for him to work a midnight schedule. In recent years, he has been accommodated because of his medical condition and allowed to work either a day shift or an afternoon position. He was recently informed that his accommodation may not be possible in the future. It is my belief that attempts to work a midnight schedule could exacerbate his seizure disorder and produce life-threatening seizures once again. In view of this, I cannot recommend that he work a midnight schedule.

Mr. Runkle's seizure disorder is a permanent condition and I do not expect a fundamental change in his condition in the future.

[Defendant's Ex. 7.]

Leonard Brown, the Human Resources Manager for the Detroit Post Office, also received a letter from Congresswoman Lynn Rivers with copies of letters from Mr. Runkle and his doctor, asking him to review the matter and consider accommodating Mr. Runkle's disability "consistent with applicable law." [*See* Defendant's Ex. 5.] Mr. Brown forwarded the Congresswoman's correspondence to Stephanie McCarthy.

Ms. McCarthy sought Mr. Brown's advice as to how she should handle Mr. Runkle's request for reasonable accommodation, and she was told to instruct Mr. Runkle to submit a request to Brown for reassignment to another craft[5] or facility. McCarthy did not have the authority to unilaterally reassign Runkle to another postal facility. Only Runkle himself could request an assignment to another installation or another craft.[6]

Ms. McCarthy testified in her deposition that allowing Runkle to be permanently assigned to Tour 2 would have disrupted the business operations of the Detroit

---

**5.** Postal workers at the Detroit BMC are divided into two "crafts"—clerks and mail handlers. Each craft is represented by a separate bargaining unit. Runkle was a member of the clerk craft.

**6.** Defendant states that it would have violated the collective bargaining agreement if it had unilaterally transferred Plaintiff to another facility without his authorization.

BMC because all part-time flexible employees were scheduled to work on Tour 1 based on the operational needs mandated by the July 2000 tour realignment and in conjunction with agreements that had been reached with the employees unions. [*See* McCarthy Dep., Defendants. Ex. 25, p. 92.] Ms. Alvarado testified that the Postal Service would have suffered an undue hardship by permanently assigning Runkle to either Tour 2 or Tour 3 because those tours were already fully staffed and all part-time flexible clerks were needed on Tour 1 to cover the bulk of the mail processing operations for that tour. [Defendant's Ex. 24, p. 66.]

McCarthy responded to Mr. Runkle's letter in writing on January 11, 2001. In her letter she stated as follow:

Dear Mr. Runkle:

This letter is in response to your request that I received January 11, 2001 requesting a change of schedule.

Since May 2000, I have reasonably accommodated you and allowed you to work on Tour 2. At this time, all part-time regular employees have been instructed to return to their regular tour, which is Tour 1. During the time that you were accommodated if you were unable to work your assigned shift, you could have investigated employment at other facilities that may have Tour 2 positions available.

At the time you were hired, you were aware that you might be needed to work any hours since we are a 24–hour facility. Due to contractual issues, and fairness to others, you must return to your assigned shift.

If you are unable because of medical reasons to work the Tour 1 shift, I suggest you contact Mr. Leonard Brown, Manager Human Resources, 1401 W.

Fort St., Detroit MI 46233–9994 and request a transfer to an office that has Tour 2 work hours available.

[Defendant's Ex. 10.]

Runkle did not pursue Ms. McCarthy's suggestion to contact Mr. Brown and request a transfer to another facility. Instead, he wrote McCarthy another letter stating that he found her suggestion unreasonable because he would lose the seniority he had accrued at the Detroit BMC. *See* Defendant's Ex. 12; *see also* Plaintiff's Dep., Defendant's Ex. 21, pp. 57, 59. Runkle and his wife, who is also employed at the Detroit BMC, subsequently wrote letters to Ms.McCarthy requesting that they be permitted to switch tours. (Mrs. Runkle was a regular full-time career employee assigned to Tour 2.) McCarthy denied the Runkles' request without substantial explanation other than stating that "change of schedules... are not granted on a continuous basis for the employees' convenience." *See* Defendant's Ex. 17, 18.

On January 16, 2001, Runkle requested PreComplaint Counseling from the EEOC alleging disability discrimination.[7] Plaintiff elected to mediate his complaint under the EEOC's REDRESS program. On March 12, 2001, the Postal Service sent Plaintiff for an independent "fitness for duty" medical examination by Dr. Gerald F.Robbins, D.O. Dr. Robbins concluded that "a change to the midnight shift would not be in the patient's best interest medically, in view of his history of seizures." *See* Plaintiff's Ex. 16.

On March 19, 2001, the EEOC conducted a mediation under the REDRESS program. Following mediation, Plaintiff was notified that the mediator was unable to resolve the dispute. Therefore, on March

---

**7.** Plaintiff also alleged race and sex discrimination in his request for precomplaint counseling. However, he did not pursue these allegations before the EEOC and is not pursuing them here.

26, 2001, Plaintiff filed an EEO Complaint of Discrimination in the Postal Service, alleging disability discrimination on the part of the Postal Service in requiring him to report to Tour 1 despite his need for reasonable accommodation for his disability. *See* Defendant's Ex. 16. The EEOC completed its investigative file on September 17, 2001. When as of February 1, 2002, the Postal Service had not issued a final agency decision on the complaint and no final action had been taken on a decision by an EEOC Administrative Judge, Plaintiff filed his one-count Complaint in this action alleging disability discrimination under the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*

The Postal Service now has moved for entry of summary judgment in its favor arguing (1) that Plaintiff does not have a disability as defined by the Rehabilitation Act, and (2) that Plaintiff is not a "qualified individual with a disability" under the Act.

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the

---

8. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

## B. PLAINTIFF HAS FAILED TO MAKE OUT A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION UNDER THE REHABILITATION ACT

Section 504 of the Rehabilitation Act provides, in relevant part, that

[n]o otherwise qualified individual with a disability in the United States... shall, solely, by reason of her or his disability, be ... subjected to discrimination ... by the United States Postal Service.

29 U.S.C. § 794(a).

The statute further states, in relevant part, that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under... the Americans with Disabilities Act of 1990." 29 U.S.C. § 794(d). *See also McPherson v. Michigan High School Athletic Ass'n,* 119 F.3d 453, 459–60 (6th Cir.1997) ("By statute the Americans with Disabilities standards apply in Rehabilitation Act cases alleging employment discrimination.").

To make out a *prima facie* case of discrimination under the ADA or the Rehabilitation Act, the plaintiff must show:

(1) he is a disabled person within the meaning of the [Act]; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision because of his disability.

*Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir.1997); *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996).

## 1. PLAINTIFF IS NOT DISABLED WITHIN THE MEANING OF THE REHABILITATION ACT

In order to be "disabled" under the ADA or the Rehabilitation Act, the plaintiff must have "A) a physical or mental impairment that substantially limits one or more major life activities; B) a record of such impairment; or C) been regarded as having such an impairment." 42 U.S.C. § 12102(2).

■ The statutory definition of "disability" further requires a plaintiff to have a condition that "substantially limits a major life activity." 42 U.S.C. § 12102(2)(A). Thus, the mere fact that a plaintiff has a recognized "physical or mental impairment" in and of itself is not enough to establish that he has a cognizable "disability" under the federal statutes. The plaintiff must also establish that his or her impairment "substantially limits" a "major life activity." *Id.*

■ EEOC regulations define the statutory term "substantially limits" as meaning "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that

same major life activity." 29 C.F.R. § 1630.2(j)(1). The Supreme Court has further interpreted the phrase "substantially limits" as requiring a showing of a "considerable" limitation or one that limits a major life activity "to a large degree." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999).

■ Additionally, the Supreme Court has ruled that in determining whether an individual is substantially limited by an impairment that affects a major life activity, the plaintiff is to be evaluated in his or her medicated state. *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 520, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999); *Sutton v. United Air Lines, Inc., supra*, 527 U.S. at 482, 119 S.Ct. at 2146. *See also, Gilday v. Mecosta County*, 124 F.3d 760, 767 (6th Cir.1997). Further, as the Court made clear in *Sutton*, "Because the phrase 'substantially limits' appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be *presently*—not potentially or hypothetically—substantially limited in order to demonstrate a disability." 527 U.S. at 482, 119 S.Ct. at 2146.

The regulations further define the term "major life activities". *See*, 29 C.F.R. § 1630.2(i). As provided in the regulations, the term "major life activities" includes functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Id.* Further, according to the regulations, whether an impairment "substantially limits" a major life activity is determined by considering (1) the nature and severity of the impairment; (2) its duration or expected duration; and (3) its permanent or expected permanent or long-term impact. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

As more fully developed below, applying the foregoing authorities to the facts as alleged by Plaintiff in this case, the Court finds that Plaintiff is not a "disabled" person within the meaning of the federal statute.

■ As an initial matter, Defendant does not appear to dispute that Plaintiff's epilepsy/seizure disorder is a physical impairment. The issue, therefore, is whether Plaintiff's impairment substantially limits one or more major life activities. Plaintiff asserts that his epilepsy/seizure disorder substantially limits him in performing the major life activities of caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working. However, Plaintiff has presented no evidence whatsoever of any inability due to his seizure disorder in performing manual tasks, walking, seeing, hearing, or speaking. With respect to the life activity of breathing, while Plaintiff has presented evidence that 19 years ago, in 1984, when he last had a grand mal seizure, he suffered respiratory arrest. However, he has not suffered respiratory arrest or had a grand mal seizure since that one time. The evidence of record is that since that time his seizure disorder has been controlled by medication and he has had only occasional twitching of his chin or arm and jerking of his legs at night, and occasional "staring" spells when he may be "out of it" for a few seconds, after which he does not know what happened and is confused. *See* Plaintiff's Ex. 11, 12, 14, 16. These brief spells happen about two or three times per month. *Id.*

■ As the Supreme Court stated in *Sutton*,

A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating mea-

sures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

*Sutton*, 527 U.S. at 482–83, 119 S.Ct. at 2146.

The Fourth Circuit addressed this issue in *EEOC v. Sara Lee Corporation*, 237 F.3d 349 (4th Cir.2001), a case where, as in the instant action, where the defendant's employee claimed disability discrimination (under the ADA) as a result of an epileptic seizure disorder.

Like Plaintiff Runkle, Vanessa Turpin, the aggrieved employee in the *Sara Lee* case, had only occasional nocturnal and daytime seizures. The nocturnal seizures were characterized by kicking, salivating and, on one occasion, bedwetting. *Id.* at 351. Turpin's daytime seizures were milder in nature. They normally lasted only a few minutes during which time Turpin would begin shaking, and she would "zone out" for a few minutes. *Id.* After the seizure ended, Turpin would just return to whatever work she had been performing before the episode began. *Id.* Turpin's doctor opined that her seizures, although not life threatening, would be a "life-long phenomena." *Id.*

In her disability discrimination suit brought under the ADA, Plaintiff claimed that her seizure disorder substantially limited three different major life activities— sleeping, thinking, and caring for herself. *Id.* The Fourth Circuit held that, although permanent, her intermittent seizures did not substantially limit a major life activity: "To hold that a person is disabled whenever that individual suffered from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds." *Id.* at 352.

With regard to the major life activity of working, the term "substantially limits" means:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and ability. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). *See also, Sutton v. United Air Lines, supra* ("When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." 119 S.Ct. at 2150); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1417 (10th Cir.1992) (being substantially limited in the major life activity of working does not mean working at a job of one's choice).

The regulations further instruct that to determine whether a plaintiff is substantially limited in the major life activity of working, a court may consider:

the number of types of jobs utilizing similar training, knowledge, skills or abilities, within the [plaintiff's] geographic area from which the individual is also disqualified because of the impairment (class of jobs).

19 C.F.R. § 1630.2(j)(3)(ii)(B). The court may also consider:

the numbers and types of other jobs *not* utilizing similar training, knowledge, skills or abilities, within that geographic area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii)(C) (emphasis added).

Consistent with the foregoing, courts have concluded that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from

performing a particular job. *See Sutton v. United Air Lines, supra* (plaintiffs' severe myopia only prevented them from working as global airline pilots); *McKay v. Toyota Motor Manufacturing U.S.A., Inc.,* 110 F.3d 369, 373 (6th Cir.1997) (plaintiff's carpal tunnel syndrom which only prevented her from performing a narrow range of assembly line jobs held not to be an impairment that substantially limited her ability to work, in general); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1250 (6th Cir.1985) (where plaintiff's eye impairment, although a permanent one which prevented him from performing the functions of a Postal Service Distribution Clerk, did not interfere with his ability to work in other jobs, he was not substantially limited in the life activity of working); *Wooten v. Farmland Foods,* 58 F.3d 382, 383 (8th Cir.1995) (finding impairment of the plaintiff's hand which interfered with the ability to perform a narrow range of meat packing jobs was not a substantially limiting major life function); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723 (5th Cir. 1995) (plaintiff who lost use of her right arm due to a gun accident was not substantially limited in the life activity of working where she failed to show that her impairment disqualified from other jobs requiring similar training); *Redlich v. Albany Law School of Union University,* 899 F.Supp. 100 (N.D.N.Y.1995) (plaintiff who suffered a stroke and lost the use of his left leg, arm and hand did not have an ADA-cognizable "disability" where he still could work a number of positions within the class of job in which he was engaged); *Sorensen v. University of Utah Hospital,* 194 F.3d 1084 (10th Cir.1999) (although plaintiff with multiple sclerosis had a cognizable physical impairment, she was not disabled under the ADA where her disability did not disqualify her from performing other jobs for which she qualified by virtue of her education and training.)

The foregoing authorities make clear that the mere fact that Plaintiff has an obvious physical impairment is not sufficient to establish that he is "disabled" under Rehabilitation Act/ADA standards. As the Second Circuit explained in *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867 (2nd Cir.1998),

> Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.

*Id.* at 870.

Here, Plaintiff has only shown, at best, an inability to work on a single shift.. Further, Plaintiff's work history belies any argument of being substantially impaired in the life activity of working.

Plaintiff relies upon *Otting v. J.C. Penney Co.,* 223 F.3d 704 (8th Cir.2000) for the proposition that the Court should consider Plaintiff's manifestations of his impairment as a whole and accordingly conclude that Plaintiff is disabled. Otting had much more serious epileptic symptoms than Runkle does. Otting had severe grand mal seizure symptoms—inability to speak, walk, see, work or control the left side of her body—which were uncontrolled despite medication and brain surgery to remove a portion of her right frontal lobe.

Similarly, the plaintiff in *Rowles v. Automated Production Systems, Inc.,* 92 F.Supp.2d 424 (M.D.Pa.2000), also had more serious epileptic symptoms. In that case, as in *Otting,* the plaintiff continued to suffer grand mal seizures despite being medicated. In any event, *Otting* and *Rowles* are not applicable to the case at bar because, as the Supreme Court has emphasized, the determination of a disability is an individualized inquiry. *See Sutton,* 527 U.S. at 483, 119 S.Ct. at 2147. ("The determination of whether an individual has a disability is not necessarily based

on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of that individual." (Citation omitted)); *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 199, 122 S.Ct. 681, 692, 151 L.Ed.2d 615 (2002) ("An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person.") As the cases cited demonstrate, epilepsy or a seizure disorder is a condition whose symptoms vary widely from person to person. Therefore, that the plaintiffs in *Otting* and *Rowles* were found to be disabled under the ADA by virtue of their epileptic symptoms is not controlling in this case.

■ For the foregoing reasons, the Court finds that Plaintiff has failed to establish that he has a disability entitling him to relief under the Rehabilitation Act.[9]

## 2. *PLAINTIFF CANNOT PERFORM AN ESSENTIAL FUNCTION OF HIS JOB*

■ Even assuming *arguendo* that Plaintiff has shown that he is disabled, he still must establish that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Burns v. Coca–Cola Enterprises, Inc.,* 222 F.3d 247, 256 (6th Cir. 2000). Courts must consider "the employer's judgment as to what functions of a job are essential." *Brickers v. Cleveland Board of Education,* 145 F.3d 846, 849 (6th Cir.1998). "An accommodation that eliminates an essential function of the job is unreasonable *per se." Jasany v. United States Postal Service, supra,* 755 F.2d at 1250. In *Jasany,* the Sixth Circuit determined that the post office was not required to accommodate the Rehabilitation Act plaintiff by eliminating one of the essential functions—scheduling flexibility—of his part-time flexible clerk position.

■ Like *Jasany,* Plaintiff here was hired as a part-time flexible clerk. The Detroit BMC operates 24 hours per day. Plaintiff admitted at his deposition that when he was hired, it was explained to him that because he was a part-time flexible employee, he was required to be available to work any of the three tours of duty. *See* Plaintiff's Dep., p. 55. Part-time flexible employees have no specific duty assignment and are utilized to meet the operational needs of the Postal Service. *See* Alvarado Dep., p. 20. Runkle acknowledges that postal management has the authority under the CBA to assign all of the part-time flexible employees at the Detroit BMC to Tour 1. [Plaintiff's Dep., pp. 35, 37.]

Because the Postal Service is not required to eliminate the requisite flexibility

**9.** Plaintiff also has argued that he qualifies for relief under the Act because he has a "documented record of impairment." The relevant regulation defines "record of impairment" as meaning that a person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). The impairment indicated in the record *must be an impairment that substantially limits one or more of the individual's major life activities. See Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1229 (11th Cir.1999); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2nd Cir.1998); *Davidson v. Midelfort Clinic Ltd.,* 133 F.3d 499, 510 n. 7. (7th Cir.1998); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120–21 (5th Cir.1998). As discussed above, Plaintiff here has failed to show that his seizure disorder "substantially limits one or more major life activity."

This same "substantially limiting" standard also applies to be entitled to the Act's protection against being "regarded" as disabled. As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual. *Hilburn, supra,* 181 F.3d at 1230.

inherent in his position, Plaintiff has not shown that he is a qualified individual with a disability who can perform the essential functions of the position held or desired, with or without reasonable accommodation.

### 3. DEFENDANT IS NOT REQUIRED TO VIOLATE THE CBA TO ACCOMMODATE PLAINTIFF

 Even if the Court were to find that Plaintiff is a qualified individual with a disability and that he can perform the essential functions of the job, the circuit courts have uniformly held that an accommodation that violates a collective bargaining agreement is *per se* unreasonable. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir.1998) (a reasonable accommodation by means of "reassignment will not require creating a new job, moving another employee, promoting the disabled employee, or *violating another employee's rights under a collective bargaining agreement*" (emphasis added)); *Willis v. Pacific Maritime Ass'n*, 244 F.3d 675, 680–82 (9th Cir.2001); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1307 (11th Cir. 2000); *Feliciano v. Rhode Island*, 160 F.3d 780, 787 (1st Cir.1998); *Kralik v. Durbin*, 130 F.3d 76, 81–83 (3d Cir.1997); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir.1997); *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir.1996); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir.1995); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995).

A disabled plaintiff is only entitled to a "reasonable" accommodation. To permanently reassign Plaintiff Runkle to Tour 2 or Tour 3 would violate the collective bargaining agreement with Plaintiff's union. *See* McCarthy Dep., p. 92; Alvarado Dep., pp. 66–68. Under these circumstances, controlling law establishes that such an accommodation would be unreasonable. Therefore, the Postal Service is not required under the Rehabilitation Act to reassign Mr. Runkle to another shift as an accommodation for his seizure disorder.

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, with prejudice.

Let Judgment be entered accordingly.